UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

TANYA DAIGLE,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )        1:09-cv-00353-JAW
                                 )
JAROSLAV P. STULC, et al.,       )
                                 )
            Defendants.          )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

In an action by a nurse against a hospital alleging a hostile work environment under Title VII and the Maine Human Rights Act, and retaliation under Title VII, the Maine Human Rights Act and the Maine Whistleblower's Protection Act, the hospital moves for summary judgment. The Court concludes that summary judgment is appropriate as to the hostile work environment claims because the hospital took the nurse's sexual harassment complaints seriously and acted promptly and appropriately. The Court concludes that summary judgment is not appropriate as to the retaliation claims because there remains a question of fact as to whether the nurse's termination was pretextual. The Court also concludes that summary judgment is not appropriate as to the nurse's demand for punitive damages.

I.    **STATEMENT OF FACTS**

      A.    **Procedural History**

On August 6, 2009, Tanya Daigle filed a complaint in this Court against

Jaroslav P. Stulc and Redington-Fairview General Hospital ("Redington-Fairview"), alleging that Jason Stulc, a physician who was a member of the Medical Staff of Redington-Fairview, has sexually harassed her and that Redington-Fairview provided a hostile work environment for her and retaliated against her by firing her when she complained.[1]  *Compl.* (Docket # 1).  Ms. Daigle later amended the Complaint to include Dr. Stulc as a defendant.[2]  *Am. Compl.* (Docket # 25).  The Amended Complaint claims the hospital created a hostile work environment in violation of the Maine Human Rights Act (MHRA) and Title VII (Count IV), retaliated against her under the MHRA and Title VII (Count V), violated the Whistleblower's Protection Act (Count VI), engaged in impermissible gender discrimination under 42 U.S.C. §§ 2000e-2, 2000e-3, and 1981a (Count VII), and violated the Maine Human Rights Act (Count VIII).  *Am. Compl.* 40–44.

Redington-Fairview contends that it terminated Ms. Daigle's employment because she violated hospital rules, not for impermissible reasons.  On November 12, 2010, Redington-Fairview moved for summary judgment.  *Def.'s Mot. for Summ. J.* (Docket # 63) (*Def.'s Mot.*).  Ms. Daigle responded on December 17, 2010.  *Pl.'s Objection to Def.'s Mot. for Summ. J.* (Docket # 70) (*Pl.'s Resp.*).  Redington-Fairview replied on January 10, 2011.  *Def. Redington-Fairview Gen. Hosp.'s Reply Mem. in Support of Mot. for Summ. J.* (Docket # 80) (*Def.'s Reply*).

---

[1] On March 17, 2010, the Court affirmed a Recommended Decision, dismissing one of the original defendants, Trover Clinic Foundation Incorporated, on jurisdictional grounds.  *Order Affirming the Recommended Decision of the Magistrate Judge and Denying Pl.'s Mot. for Jurisdictional Disc.* (Docket # 42).

[2] After Dr. Stulc filed a suggestion of a pending Chapter 7 bankruptcy proceeding, the Court on December 21, 1008 ordered the matter stayed as to him.  *Order.* (Docket # 28)

### B. Statement of Facts

#### 1. Statements of Material Fact, Objections, and Qualified Responses

Local Rule 56 requires the parties to present "a separate, short, and concise statement of material facts" with their motion, opposition, and reply. D. ME. LOC. R. 56(b)–(d). Here, Redington-Fairview led off with 202 separate material facts. *Def.'s Statement of Undisputed Material Facts* ¶¶ 1–202 (Docket # 64) (DSMF). Ms. Daigle responded with 288 additional facts.[3] *Pl.'s Opposing Statement of Material Facts* (Docket # 71) (PODSMF). All told, the parties presented "separate, short and concise" statements containing 490 paragraphs.

That is not all. With few exceptions, each party liberally disputed the other's supposedly undisputed material facts. Of the Defendant's 202 material facts, Ms. Daigle admitted 155, objecting to, qualifying or denying the remaining 47. Of Ms. Daigle's 288 additional facts, Redington-Fairview outright admitted only 57, objecting to, qualifying, or denying all or a portion of the remaining 231. *Def. Redington-Fairview Gen. Hosp.'s Resp. to Pl.'s Opposing Statement of Material Fact* (Docket # 81) (DRPSAMF). When presented with such an unwieldy and contentious record on a motion for summary judgment, the Court is left with few good options. It does not bode well for the movant who must demonstrate that there are no genuine issues of material fact to present such a highly disputatious set of combined facts; by filling the record with hundreds of facts, great and small, and by denying,

---

[3] Plaintiff's Statement of Additional Material Facts contains two paragraph 458s, so the actual number of paragraphs differs from the numbering. PSAMF ¶¶ 203–489. The Statement of Additional Material Facts also repeats nearly verbatim ten paragraphs. PSAMF ¶¶ 415–24, 426, 431–41,

objecting, or qualifying so much of the non-movant's additional material facts, the movant effectively proves his opponent's point. At the same time, the non-movant's tactical choice to load the record with tangential facts and legal argument in the guise of facts does not create material facts where none exists.

### 2. The Undisputed Facts

In accordance with the "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to the non-movant's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

### a. Tanya Daigle

Redington-Fairview employed Tanya Daigle as a medical secretary from January 22, 2007 through November 12, 2008. DSMF ¶¶ 15–16; PODSMF ¶¶ 15–16. Redington-Fairview initially employed Ms. Daigle in Redington-Fairview Primary Care, one of its satellite offices and in April 2007, it transferred her to its newly-formed general surgery office. DSMF ¶¶ 16–17; PODSMF ¶¶ 16–17. From April 2007 to September 2007, Ms. Daigle worked in general surgery performing medical assisting work for various locum tenens surgeons as well as certain office managerial duties, and during this period, the general surgery office was staffed exclusively by the locum tenens surgeons and Ms. Daigle. DSMF ¶¶ 18–19; PODSMF ¶¶ 18–19. On September 19, 2007, Redington-Fairview hired Dr. Jaroslav Stulc as a general surgeon, and Dr. Stulc continued to work there until November 21, 2007. DSMF ¶¶ 20–21; PODSMF ¶¶ 20–21; PSAMF ¶ 412; DRPSAMF ¶ 412. Between November 21, 2007 and February 2008, Ms. Daigle

helped fill in for other offices as Redington-Fairview recruited a new general surgeon. DSMF ¶ 21; PODSMF ¶ 21. In February 2008, Dr. Shankar, a general surgeon, began working at Redington-Fairview's general surgery office. DSMF ¶ 22; PODSMF ¶ 22. As of February 1, 2008, Redington-Fairview had a medical secretary and a medical assistant working in the general surgery office. DSMF ¶ 23; PODSMF ¶ 23.

### b. The Redington-Fairview Witnesses

The Redington-Fairview witnesses to this case include: 1) Richard Willett, the Chief Executive Officer (CEO) at Redington-Fairview; 2) Dana Kempton, the Chief Financial Officer (CFO) at Redington-Fairview; 3) Deborah Buckingham, the Director of Human Resources at Redington-Fairview; 4) Raymond Leadbetter, the Practice Manager at Redington-Fairview until March 12, 2008 and Ms. Daigle's direct supervisor; 5) Linda Caron, the Practice Manager at Redington-Fairview from April 2008 through November 3, 2008 and Ms. Daigle's direct supervisor from April to May 2008; 6) Lisa Rice, Office Manager of General Surgery at Redington-Fairview, effective May 29, 2008; 7) Virginia Farley, Manager of the Post Anesthesia Care Unit (PACU) and Day Surgery at Redington-Fairview; 8) Gretchen Keany, primary charge nurse until January 2001 and since then, the Operating Room (OR) Manager at Redington-Fairview; 9) Sherry Rogers, Chief Nursing Officer at Redington-Fairview; 10) Danielle Gagnon, Registered Nurse at Redington-Fairview General Surgery from September 10, 2007 through February 5,

2009;[4] and, 11) Dr. Roger Renfrew, Medical Director of Redington-Fairview. DSMF ¶¶ 1–12, 14; PODSMF ¶¶ 1–12, 14.

### c. Dr. Jaroslav Stulc

Approximately September 1, 2007, Dr. Jaroslav Stulc began working at Redington-Fairview as a locum tenens on a per diem basis. DSMF ¶ 24; PODSMF ¶ 24. From September 1, 2007 to September 19, 2007, his work was exemplary and on September 19, 2007, he began working in Redington-Fairview's general surgery office. DSMF ¶ 24; PODSMF ¶ 24. As a condition of employment, before he became employed at Redington-Fairview, Dr. Stulc applied for membership on its Medical Staff. DSMF ¶ 25; PODSMF ¶ 25. To review his Medical Staff application, Redington-Fairview, through its Medical Staff, verified information about Dr. Stulc, including his education, qualifications, experience, work history, and background, checked with the National Practitioner Data Bank and his previous hospitals, and interviewed him. DSMF ¶ 26; PODSMF ¶ 26.

### d. The Redington-Fairview Hiring Process for Dr. Stulc

On June 2, 2007, Dr. Jaroslav P. Stulc applied to the Maine Board of Licensure in Medicine for a license to practice medicine in the state of Maine.[5] *Pl.'s*

---

[4] Ms. Daigle described Ms. Gagnon as a Registered Nurse. PSAMF ¶ 218. Redington-Fairview objected and stated that Ms. Gagnon has been a medical secretary. DRPSAMF ¶ 218. Although the Court suspects Redington-Fairview is correct, because it is required to view the facts in the light most favorable to Ms. Daigle, the Court for purposes of this motion accepts her assertion that Ms. Gagnon was a Registered Nurse.

[5] In response to a number of Ms. Daigle's additional material facts, Redington-Fairview objected to documents attached to her affidavit on the ground that Ms. Daigle does not have the personal knowledge to establish a proper foundation for admissibility. *See* DRPSAMF ¶¶ 203–07. For example, Ms. Daigle asserts in her statement of additional material facts number 203 that Dr. Stulc applied to the Maine Board of Licensure of Medicine on June 2, 2007 for a license to practice medicine in the state of Maine. PSAMF ¶ 203. She bases this statement on her affidavit, which

*Separate Statement of Additional Facts* ¶ 203 (Docket # 71) (PSAMF); DRPSAMF ¶

203.  As a part of his application, Dr. Stulc signed under penalties of perjury an

"Affidavit of Applicant," which affirmed that all of his statements were true.[6]

PSAMF ¶ 204; DRPSAMF ¶ 204.  In his application, Dr. Stulc was asked: "Have you

EVER had your hospital, HMO, or other healthcare entity privileges revoked,

suspended, restricted, limited in any way, or withdrawn involuntarily?"  PSAMF ¶

205 (capitalization in original); DRPSAMF ¶ 205.  Dr. Stulc circled "No," which was

false.  PSAMF ¶¶ 205, 206; DRPSAMF ¶¶ 205, 206.  The application also asked:

"Have you EVER voluntarily surrendered privileges or resigned from staff

membership during peer review or investigation or to avoid peer review or

investigation?" PSAMF ¶ 207; DRPSAMF ¶ 207 (capitalization in original).  Dr.

Stulc circled "No," which was false.  PSAMF ¶¶ 207, 208; DRPSAMF ¶¶ 207, 208.

Dr. Stulc committed perjury while applying to the Maine Board of Licensure in

Medicine in order to practice medicine and surgery in the state of Maine.  PSAMF ¶

209; DRPSAMF ¶ 209.

   By contrast, in his application for Medical Staff privileges at Redington-

---

attached a copy of what appears to be Dr. Stulc's June 1, 2007 license application to the Maine Board
of Licensure of Medicine.  *Permanent MD License Application* at 3–4 (Docket # 73).  The evidentiary
standard for the authentication is a low bar; the proponent must satisfy the Court that the "the
matter in question is what its proponent claims."  FED. R. EVID. 901(a).  Here, for purposes of the
pending motion, the doctor's application has sufficient indicia of authenticity to meet this low hurdle.
The Court overrules all the Defendant's objections to the exhibits attached to Ms. Daigle's affidavit.
[6] In its response to this portion of Ms. Daigle's additional material facts, Redington-Fairview has
interposed a number of objections to the paragraph and has denied the statements.  *See* DRPSAMF
¶¶ 204–13.  For example, Redington-Fairview denied that the application contained the questions
and answers that Ms. Daigle alleged.  DRPSAMF ¶ 205, 207.  Ms. Daigle filed a copy of the
application with the Court and the questions and answers clearly appear as quoted in the
application.  The Court does not consider Redington-Fairview's denial of what is an evident fact in
good faith and it treats these statements as admitted.  In any event, the Court is required at this
stage to view the facts in the light most favorable to the non-movant consistent with record support.

Fairview, Dr. Stulc acknowledged that his clinical privileges or employment at a hospital or other facility had been limited, suspended, revoked, or renewed, or made subject to probationary conditions or otherwise adversely affected. PSAMF ¶ 211; DRPSAMF ¶ 211. If Redington-Fairview reviewed both Dr. Stulc's application to the Board of Licensure in Medicine and his application for Medical Staff privileges, it would have known or should have known that he had lied on his application for a medical license. PSAMF ¶ 212; DRPSAMF ¶ 212.

During his interviews and pre-employment meetings, Dr. Stulc advised Messrs. Willett and Kempton and Dr. Renfrew that he had voluntarily obtained treatment for anger management at Trover Regional Medical Center, where he previously worked.[7] DSMF ¶ 27; PODSMF ¶ 27. Later, Redington-Fairview received information from a psychologist that Dr. Stulc had made significant progress with his anger issues and the psychologist had no reservations about his ability to function appropriately.[8] DSMF ¶ 28; PODSMF ¶ 28. After a recommendation from the Medical Staff, a review of the background material,

---

[7] Ms. Daigle asserts in her additional material fact paragraph 215 that Mr. Willett "knew [Dr.] Stulc was suspended for anger management issues before he was hired." PSAMF ¶ 215. Redington-Fairview objected on the ground that the testimony cited by Ms. Daigle does not support the assertion. DRPSAMF ¶ 215. The Court agrees with Redington-Fairview and strikes Plaintiff's paragraph 215 as not supported by the record. The next proffered fact, paragraph 216, assumes the truth of paragraph 215 and to that extent the Court also strikes Plaintiff's paragraph 216. Further, Redington-Fairview objects to paragraph 216 on the ground that the testimony cited by Ms. Daigle does not support the assertion. DRPSAMF ¶ 216. First, the record citation by Ms. Daigle does not support the assertion. Second, as Redington-Fairview pointed out, the statement is contradicted by other portions of Mr. Willett's testimony. The Court strikes Plaintiff's material fact paragraph 216.

[8] Ms. Daigle cryptically objected to this material fact, stating only "hearsay; not admissible." PODSMF ¶ 28. The Court overrules the objection. The statement from the psychologist is not for the truth of the matter but reflects Redington-Fairview's due diligence and actual knowledge of Dr. Stulc's propensities, matters squarely raised by Ms. Daigle's charge that Redington-Fairview was negligent in hiring Dr. Stulc. As Ms. Daigle has not denied the paragraph, the Court accepts the statement of fact for purposes of this motion.

personal meetings and interviews with Dr. Stulc, and discussions with Dr. Renfrew, Mr. Willett, the Redington-Fairview CEO, decided to hire Dr. Stulc. DSMF ¶ 29; PODSMF ¶ 29.

### e.    Redington-Fairview Sexual Harassment Training

Redington-Fairview Hospital provides all employees with a copy of its sexual harassment policy and it trains all employees on this policy during their initial orientation. DSMF ¶ 30; PODSMF ¶ 30. Further, Redington-Fairview requires all employees to take harassment training through e-learning on an annual basis. DSMF ¶ 31; PODSMF ¶ 31. After Redington-Fairview first hired Ms. Daigle, she was given a copy of the sexual harassment policy, received sexual harassment training, and undertook annual reviews. DSMF ¶¶ 33–35; PODSMF ¶¶ 33–35.

### f.    Tanya Daigle's Initial Problems

Either during the last week of September or the first week of October, 2007, a few weeks after Dr. Stulc began working at Redington-Fairview, Ms. Daigle began to experience problems with him. DSMF ¶ 36; PODSMF ¶ 36. Her first uncomfortable encounter took place when Dr. Stulc yelled at her and told her not to second guess him when she called to the Hospital to find out when he would return to the office. DSMF ¶ 37; PODSMF ¶ 37. The Monday after the incident, Ms. Daigle reported her concern about Dr. Stulc's verbal abuse to Mr. Leadbetter, her direct supervisor, and Dr. Renfrew, and Mr. Leadbetter assured her that he would address it with the doctor. DSMF ¶¶ 38–39; PODSMF ¶¶ 38–39. Dr. Renfrew asked Ms. Daigle to set up a meeting among Dr. Stulc, Virginia Farley, himself and herself to work out expectations. DSMF ¶ 40; PODSMF ¶ 40.

About one month later, however, Dr. Stulc became upset when Ms. Daigle told him that she could not read a word of what he had written on a form, and he told her she should go back to school. DSMF ¶ 41; PODSMF ¶ 41. Ms. Daigle observed that Dr. Stulc is a very vocal man and he interacted this way with both men and women. DSMF ¶ 42; PODSMF ¶ 42.

### g.    October 10, 2007: Pornographic Images and the Hospital's Response

On October 10, 2007, while putting change back into Dr. Stulc's desktop drawer, Ms. Daigle discovered printouts of several pornographic images. DSMF ¶ 43; PODSMF ¶ 43. That same day, Ms. Daigle and Ms. Gagnon both found pornography on the hospital computer in Dr. Stulc's office.[9]  PSAMF ¶ 218; DRPSAMF ¶ 218. Ms. Daigle alerted Mr. Leadbetter who immediately came to the office and after Mr. Leadbetter viewed the printouts, he had Ms. Daigle copy them and went to the Hospital to report the incident to his supervisor, Dana Kempton. DSMF ¶¶ 44–45; PODSMF ¶¶ 44–45. This was the first time Ms. Daigle reported to management concerns about whether Dr. Stulc was viewing inappropriate images in his office at Redington-Fairview. DSMF ¶ 47; PODSMF ¶ 47.

When Mr. Kempton came to the general surgery office, Ms. Daigle and Ms. Gagnon told Mr. Leadbetter that they had witnessed a lot of inappropriate sexual behavior from Dr. Stulc, including sexually touching female patients, such as caressing their faces with the back of his hand, patting their buttocks, and rubbing

---

[9] Ms. Daigle's material fact paragraph 218 states that they found "raw" pornography on Dr. Stulc's hospital computer. PSAMF ¶ 218. Redington-Fairview objected to her characterization of the pornography. DRPSAMF ¶ 218. The Court agrees that the adjective "raw" is too vague and too subjective to be considered as a fact for purposes of the pending motion.

their buttocks with his hand.  PSAMF ¶ 219; DRPSAMF ¶ 219.

Ms. Gagnon also told Mr. Kempton about what she considered to be inappropriate verbal sexual conduct with a male patient, who was being seen for rectal bleeding.[10]  PSAMF ¶ 220; DRPSAMF ¶ 220.  They reported that Dr. Stulc had said to the man: "You know, we're going to go places where no one has gone. Not even your wife—even though I let my wife go there. (chuckle)."  *Id.*  Ms. Gagnon complained that as a female medical assistant, Dr. Stulc's comments made her feel very embarrassed and uncomfortable.  PSAMF ¶ 221; DRPSAMF ¶ 221.  Ms. Gagnon had informed Redington-Fairview of this conduct shortly after it occurred.[11] PSAMF ¶ 233; DRPSAMF ¶ 233.

Dr. Stulc was not in the office that day.  DSMF ¶ 46; PODSMF ¶ 46.  Mr. Kempton and Mr. Leadbetter met with Dr. Stulc, showed him the images, and Dr. Stulc admitted he had printed them.  DSMF ¶ 48; PODSMF ¶ 48.  Mr. Kempton told Dr. Stulc that Redington-Fairview would not tolerate this type of behavior. DSMF ¶ 49; PODSMF ¶ 49.

On October 12, 2007, Mr. Kempton and Mr. Leadbetter met with both Ms. Daigle and Ms. Gagnon and Mr. Kempton apologized to Ms. Daigle and assured her that the Hospital would not retaliate against her for reporting Dr. Stulc.[12]  DSMF ¶

---

[10] Redington-Fairview objects to this paragraph on evidentiary grounds.  DRPSAMF ¶ 220.  The Court overrules the objection.

[11] Redington-Fairview objects to this paragraph on evidentiary grounds.  DRPSAMF ¶ 233.  The Court overrules the objection.

[12] Redington-Fairview's material fact paragraph 53 states that Mr. Kempton told Ms. Daigle that there would be no retaliation for coming forward with her concerns.  DSMF ¶ 53.  Ms. Daigle's response was limited to: "Denied (Daigle Aff. ¶¶ 36–48)."  This is not a proper response.  The Court has no obligation to search through a party's reference to multiple paragraphs in an affidavit to ferret out the basis of the party's objection.  *Ricci v. Applebee's Ne., Inc.*, 297 F. Supp. 2d 311, 321 (D.

51–53; PSAMF ¶ 223; DRPSAMF ¶ 223. In fact, Redington-Fairview management had always instructed Ms. Daigle that if she were to witness something that was ethically wrong, she should report it to management as she did to Mr. Leadbetter, and Ms. Daigle signed an ethical statement to that effect on November 16, 2007.[13] PSAMF ¶ 231; DRPSAMF ¶ 231.

Mr. Kempton informed them that Dr. Stulc admitted to looking up pornography during office hours and that he was remorseful. PSAMF ¶ 223; DRPSAMF ¶ 223. On October 12, 2007, Mr. Kempton wrote that he was concerned that Dr. Stulc was viewing pornography at work, even though he expressed remorse, there was "such a disconnect between expressed remorse and something so obviously wrong" as viewing pornography while at work before examining female patients. PSAMF ¶ 241; DRPSAMF ¶ 241. Ms. Daigle and Ms. Gagnon told Mr. Kempton that they felt they could continue to work with Dr. Stulc if he was remorseful and if he promised not to engage in similar behavior again. DSMF ¶ 54; PODSMF ¶ 54. Believing that a mediator would be present, Ms. Daigle and Ms. Gagnon agreed to meet with Dr. Stulc. DSMF ¶ 55; PODSMF ¶ 55; PSAMF ¶ 223; DRPSAMF ¶ 223.

At the October 12, 2007 meeting, Ms. Daigle informed Mr. Kempton and Mr. Leadbetter that Dr. Stulc had verbally threatened her and had placed her in fear in

---

Me. 2003) ("Local Rule 56 was designed to halt the former summary judgment practice of submitting a voluminous record and leaving to the court the duty to comb the record in search of material facts"). Moreover, in reviewing the cited paragraphs of the Daigle affidavit, the Court could find no statement contradicting Redington-Fairview's material fact paragraph 53. The Court treats the paragraph as admitted by Ms. Daigle.

[13] Ms. Daigle's additional material fact paragraph 231 continues with a legal argument, not a statement of fact and the Court has not considered the third and fourth sentences of paragraph 231.

her own office.[14]   PSAMF ¶ 223; DRPSAMF ¶ 223.   Mr. Kempton excused the doctor's conduct saying that Dr. Stulc was under a lot of stress. PSAMF ¶ 223; DRPSAMF ¶ 223.

Mr. Kempton and Mr. Leadbetter met with Dr. Stulc and told him that he must meet with Ms. Daigle and Ms. Gagnon.  DSMF ¶ 56; PODSMF ¶ 56.  On October 15, 2007, Ms. Daigle and Ms. Gagnon went to Mr. Kempton's office. PSAMF ¶ 224; DRPSAMF ¶ 224.   There was no mediator present and Ms. Buckingham was not present either.  PSAMF ¶ 224; DRPSAMF ¶ 224.  In fact, Ms. Buckingham was not aware of the meeting.  PSAMF ¶ 239; DRPSAMF ¶ 239.  The meeting took place among Dr. Stulc, Ms. Daigle, Ms. Gagnon, Mr. Kempton, and Mr. Leadbetter.  DSMF ¶ 57; PODSMF ¶ 57.  Ms. Daigle felt intimidated and found it difficult to speak because there was no mediator or female management personnel present.  PSAMF ¶¶ 224, 229; DRPSAMF ¶¶ 224, 229.

At the October 15, 2007 meeting, Dr. Stulc said, "Well, I guess I have been a bad, bad boy" and "I am just a guy."[15]   PSAMF ¶ 225; DRPSAMF ¶ 225.   Mr. Kempton chuckled at the doctor's remark.  PSAMF ¶ 225; DRPSAMF ¶ 225.  Dr. Stulc excused his behavior by saying that he and his wife viewed computer pornography all the time, that he was used to having his own private practice, and that he did not see any harm in what he was doing.  PSAMF ¶ 225; DRPSAMF ¶

---

[14]  Redington-Fairview denies this part of Plaintiff's additional material fact paragraph 223. DRPSAMF ¶ 223.   Because the Court is required to view the record evidence in the light most favorable to Ms. Daigle, the Court has considered the paragraph as true for purposes of the pending motion.

[15]  Redington-Fairview objected to this statement on evidentiary grounds.  DRPSAMF ¶ 223.  The Court overrules Redington-Fairview's objection.

225.  Nevertheless, Dr. Stulc apologized for his behavior and said he would like to continue to work with Ms. Daigle and Ms. Gagnon.  DSMF ¶ 59; PODSMF ¶ 59.  Although Mr. Kempton thought Dr. Stulc was genuinely sorry, Ms. Daigle did not.  DSMF ¶ 60; PODSMF ¶ 60; PSAMF ¶ 225; DRPSAMF ¶ 225.  In Ms. Daigle's presence, Mr. Kempton told Dr. Stulc that downloading pornography on the office computer, where Ms. Gagnon and Ms. Daigle could be exposed to it, would not be tolerated and constituted sexual harassment.[16]  PSAMF ¶ 226; DRPSAMF ¶ 226.  Mr. Kempton and Mr. Leadbetter told Dr. Stulc that the Hospital had a "zero tolerance" policy against conduct of a sexual nature and looking at pornography before and after he examined female patients is ethically wrong and would not be tolerated.[17]  PSAMF ¶ 230; DRPSAMF ¶ 230.

At the same meeting, however, Dr. Stulc said that he "doesn't like to be second-guessed and cannot have that in my office."[18]  PSAMF ¶ 227; DRPSAMF ¶ 227.  When Dr. Stulc said that a lot of what he does in the office setting is "his

[16] Redington-Fairview objected to the portion of this paragraph in which Mr. Kempton is alleged to have told Dr. Stulc that downloading pornography would constitute sexual harassment.  DRPSAMF ¶ 226.  The Court is required to view the evidence in the light most favorable to Ms. Daigle and assumes the truth for purposes of this motion of the objected to portion of Ms. Daigle's paragraph.

[17] Redington-Fairview made an evidentiary objection to this paragraph.  DRPSAMF ¶ 230.  The Court overrules the Hospital's objection.

[18] Redington-Fairview made an evidentiary objection to Dr. Stulc's statement.  DRPSAMF ¶ 227.  The Court overrules the Hospital's objection.  In her additional material fact paragraph 227, however, Ms. Daigle goes on to say that "[t]his statement was an implied threat against Ms. Daigle's employment, and an expression by [Dr.] Stulc of the power he perceived himself to have, as a male doctor, over Plaintiff and Danielle Gagnon, in the form of power to prevent Plaintiff and Danielle Gagnon from bringing [Dr.] Stulc's inappropriate behavior and the hostile work environment it created to the attention of [Redington-Fairview's] management.  Neither Mr. Kempton, the Chief Financial Officer, nor Mr. Leadbetter, both male members of management, disputed [Dr.] Stulc's threat, a failure which Plaintiff reasonably believed constituted acquiescence by [Redington-Fairview], and, as such, another component of the sexually hostile work environment.  PSAMF ¶ 227.  The Court strikes the latter assertions: they do not posit facts; they make legal arguments in the guise of facts.

style," for example, caressing female patients, neither Mr. Kempton nor Mr. Leadbetter told him that "his style" was unethical and violated state and federal law.[19] PSAMF ¶ 228; DRPSAMF ¶ 228. Furthermore, although Ms. Daigle had asked Mr. Leadbetter and Mr. Kempton to tell Dr. Stulc not to verbally abuse her, they failed to mention to him that such abuse or hostility is against Hospital policy.[20] PSAMF ¶ 229; DRPSAMF ¶ 229.

For a few weeks, Dr. Stulc was fine and things went smoothly in general surgery. DSMF ¶ 63; PODSMF ¶ 63. Even so, after the images were found in his drawer, Mr. Kempton made arrangements for Dr. Stulc to meet with a psychologist because he was concerned that even though Dr. Stulc was remorseful, there could have been some underlying issues that precipitated his viewing inappropriate images at work. DSMF ¶ 64; PODSMF ¶ 64.

### h. October 15–November 19, 2007: Additional Problems[21]

On October 18, 2007, Dr. Stulc falsely told one of Ms. Daigle's co-workers that Ms. Daigle "obviously didn't know what time the surgeries are, and that is why he is

---

[19] Redington-Fairview made an evidentiary objection to Dr. Stulc's statement and the lack of response from Hospital administration. DRPSAMF ¶ 228. The Court overrules Redington-Fairview's objection. By the same token, the Court has not included a portion of the Plaintiff's paragraph that is argument, not fact.

[20] Redington-Fairview objected to and denied this statement. DRPSAMF ¶ 229. The Court overrules the objection and, viewing the evidence in the light most favorable to Ms. Daigle, accepts the truth of the paragraph for purposes of this motion.

[21] In her additional material facts, Ms. Daigle presents evidence of other misconduct by Dr. Stulc that continued directly after the October 15, 2007 meeting. PSAMF ¶¶ 242–43. The Court finds these allegations difficult to square with Ms. Daigle's other admission that "[d]uring the few weeks after this meeting, Dr. Stulc was fine, and things in the general surgery office went smoothly." DSMF ¶ 63; PODSMF ¶ 63.

late all of the time."[22]  PSAMF ¶ 242; DRPSAMF ¶ 242.  Of all the doctors, Dr. Stulc was the only one who was consistently late and who complained about Ms. Daigle's scheduling.  PSAMF ¶ 242; DRPSAMF ¶ 242.

Sometime after October 15, 2007, Dr. Stulc performed a pre-operative examination on a teenaged female and afterwards, he inappropriately patted her buttocks with his hand.[23]  PSAMF ¶ 243; DRPSAMF ¶ 243.

On October 19, 2007, Ms. Daigle told Mr. Leadbetter, her supervisor, that she had felt intimidated by the circumstances of the October 15, 2007 meeting in Mr. Kempton's office and that she had been under the impression on October 12, 2007, there would be a mediator at that meeting so she could speak freely.  PSAMF ¶ 244; DRPSAMF ¶ 244.  Mr. Leadbetter replied that "Dr. Stulc is not going anywhere and if [you cannot] work with the doctor," he would "find another position" for her.  PSAMF ¶ 244; DRPSAMF ¶ 244.

On October 26, 2007, Dr. Stulc stated in the presence of a 15 year old female while raising his eyebrows, "Boy, they don't make them like that anymore," and "They never made them like that when I was younger."  PSAMF ¶ 258; DRPSAMF ¶ 258.

On November 13, 2007, Dr. Renfrew gave Dr. Stulc his five-week review.[24]

---

[22] Redington-Fairview objected to this statement on evidentiary grounds.  DRPSAMF ¶ 242.  The Court overrules Redington-Fairview's objection.

[23] Redington-Fairview objected to this statement on evidentiary grounds.  DRPSAMF ¶ 243.  The Court overrules Redington-Fairview's objection

[24] Redington-Fairview objects on evidentiary grounds to this statement.  DRPSAMF ¶ 246.  The Hospital says that Dr. Renfrew met with Dr. Stulc in early November to discuss his five week evaluation but never completed it.  *Id.*  From the Court's perspective, whether Dr. Renfrew began or completed his five-week evaluation of Dr. Stulc on November 13, 2007 is not material to the pending motion.  Redington-Fairview also objects about what Ms. Daigle recalled Dr. Stulc said about the

PSAMF ¶ 246; DRPSAMF ¶ 246. Dr. Stulc told Ms. Daigle that the Hospital had said he was doing a wonderful job and to keep up the good work. PSAMF ¶ 246; DRPSAMF ¶ 246. Dr. Stulc appeared happy with the review and was bragging about it in the office. PSAMF ¶ 246; DRPSAMF ¶ 246. He made no mention of any comments about his violation of Redington-Fairview ethical policies respecting female employees and patients. PSAMF ¶ 246; DRPSAMF ¶ 246.

On November 14, 2007, Dr. Stulc made rude and inappropriate comments of a sexual nature, and each day thereafter, Dr. Stulc subjected Ms. Daigle to verbal abuse and an uncomfortable work environment.[25] PSAMF ¶ 247; DRPSAMF ¶ 247. On that same day, Dr. Stulc was scheduled to see patients at 1:00 p.m. but at about 1:15 p.m. called the general surgery office to inform them he was going to be late. PSAMF ¶ 248; DRPSAMF ¶ 248. Ms. Daigle asked Dr. Stulc when they could expect him and he replied, as soon as "[I am] done saving lives." *Id.* As more time passed, Ms. Daigle began to reschedule patients. PSAMF ¶ 248; DRPSAMF ¶ 248. Dr. Stulc arrived at 3:30 p.m. PSAMF ¶ 248; DRPSAMF ¶ 248. After the last patient left, Ms. Daigle asked Dr. Stulc to have someone call if he knew he was going to be late so that they could call the patients to reschedule. PSAMF ¶ 248;

---

review. *Id.* This objection is overruled since Ms. Daigle is not offering Dr. Stulc's comments for their truth but for her perception of how Redington-Fairview was handling her complaints against Dr. Stulc. Finally, the Court will not consider the fifth and sixth statements in Plaintiff's additional material fact paragraph 246 since they make arguments, and do not posit facts.

[25] Redington-Fairview objects on evidentiary grounds to this statement. DRPSAMF ¶ 247. The Hospital cites *Ziehm v. RadioShack Corp.*, No. 09-69-P-S, 2010 U.S. Dist. LEXIS 13782, at *6 (D. Me. May 22, 2010), for the proposition that a plaintiff cannot manufacture a genuine issue of material fact by submitting an affidavit during summary judgment that contradicts earlier clear and unambiguous testimony. However, the Court has reviewed the deposition testimony the Hospital has cited and concludes that there is an insufficient conflict between the deposition testimony and Plaintiff's additional material fact paragraph 247 to call the *Ziehm* rule into play. Finally, Ms. Daigle's reference to a sexually hostile work environment is a legal question and the Court has not considered it.

DRPSAMF ¶ 248. Dr. Stulc told Ms. Daigle not to tell him how to run his practice. PSAMF ¶ 248; DRPSAMF ¶ 248.

On November 15, 2007, after Dr. Stulc had written an illegible word on a patient consent form, Ms. Daigle asked him what the word was. PSAMF ¶ 249; DRSAMF ¶ 249. In a degrading tone in front of patients in the waiting area, Dr. Stulc told Ms. Daigle what the word was and loudly stated that she needed to go back to school, embarrassing her in front of the patients. PSAMF ¶ 249; DRSAMF ¶ 249. The problem, however, had been Dr. Stulc's penmanship, not Ms. Daigle's education. PSAMF ¶ 249; DRSAMF ¶ 249.

Also on November 15, 2007, another patient called before her follow-up appointment to state that she was in so much pain due to the procedure Dr. Stulc had performed on November 8, 2007, she had been up all night. PSAMF ¶ 250; DRPSAMF ¶ 250. Upon questioning, the patient said her pain was a 20 on a scale of 1 to 10 and that she was running a fever of 102. PSAMF ¶ 250; DRPSAMF ¶ 250. Ms. Gagnon advised the patient to go to the emergency room. PSAMF ¶ 250; DRPSAMF ¶ 250. When Dr. Stulc arrived, he said that "the whiner baby is in the emergency room." PSAMF ¶ 250; DRPSAMF ¶ 250. When Ms. Daigle told Dr. Stulc and she and Ms. Gagnon had sent the patient to the emergency room because of what she had told them, Dr. Stulc replied that was ridiculous. PSAMF ¶ 250; DRPSAMF ¶ 250.

On November 16, 2007, Dr. Stulc examined a patient for removal of an abscess on her arm. PSAMF ¶ 251; DRPSAMF ¶ 251. After he examined her, he

directed that she be scheduled for removal of the abscess during the next week and, after she left, he said that "he could have done the removal that day, but we needed to get the maximum money for visits to the office."  PSAMF ¶ 251; DRPSAMF ¶ 251.

On November 20, 2007, Dr. Stulc was again late for his appointments and Ms. Daigle and Ms. Gagnon rearranged his schedule.  PSAMF ¶ 252; DRPSAMF ¶ 252.  When he arrived, he noticed that his last patient was scheduled for 3:30 p.m. and asked Ms. Daigle to see if the patient could come in early.  PSAMF ¶ 252; DRPSAMF ¶ 252.  The patient arrived at the office at 2:15 p.m. and was immediately prepped and made ready for the procedure.  PSAMF ¶ 252; DRPSAMF ¶ 252.  Dr. Stulc was notified that the patient was ready at 2:20 p.m. but he was at his computer and on the phone with his cellular company, trying to have his phone repaired.  PSAMF ¶ 252; DRPSAMF ¶ 252.  When Ms. Daigle glanced into his office, she observed pornography on his computer screen.  PSAMF ¶ 252; DRPSAMF ¶ 252.  Dr. Stulc did not enter the procedure room until 3:00 p.m.  PSAMF ¶ 252; DRPSAMF ¶ 252.  Ms. Daigle reported this conduct to Mr. Leadbetter and she requested a meeting.  PSAMF ¶ 253; DRPSAMF ¶ 253.  The meeting never took place because it was overtaken by the events of November 21, 2007.  PSAMF ¶ 253; DRPSAMF ¶ 253.

### i.    November 20, 2007: Operational Concerns

On or about November 20, 2007, Ms. Daigle emailed Mr. Leadbetter, describing several operational issues of concern with Dr. Stulc and the general surgery office. DSMF ¶ 78; PODSMF ¶ 78.  These issues included claims that Dr.

Stulc did not always answer his pages, that he was making patients wait to see him, and that he was not a team player. DSMF ¶ 78; PODSMF ¶ 78. Mr. Leadbetter shared the email with Mr. Kempton and a meeting was scheduled for Tuesday, November 27, 2007 to discuss these concerns. DSMF ¶ 79; PODSMF ¶ 79. But the November 27, 2007 never happened because by then, Redington-Fairview had placed Dr. Stulc on administrative leave. DSMF ¶ 80; PODSMF ¶ 80.

### j. November 21, 2007: The Exam of "Jane Doe" and the PERTS Report

On November 21, 2007, two Operating Room (OR) Nurses reported to Gretchen Keaney, the OR manager at Redington-Fairview, that, prior to a surgical procedure, Dr. Stulc had examined a patient's rectal and vaginal area without wearing gloves while the patient was under general anesthesia. DSMF ¶ 85; PODSMF ¶ 85; PSAMF ¶ 285; DRPSAMF ¶ 285. Ms. Keaney reported the incident to Sherry Rogers, the Chief Nursing Office at Redington-Fairview. DSMF ¶ 86; PODSMF ¶ 86. Although Dr. Stulc violated standard precautions and infection control practices, a physical examination was appropriate before surgery. DSMF ¶¶ 87–88; PODSMF ¶¶ 87–88. The nursing staff held the view that Dr. Stulc had violated Jane Doe while she was about to have surgery and they were extremely uncomfortable witnessing Dr. Stulc perform this examination.[26] PSAMF ¶ 287; DRPSAMF ¶ 287.

Ms. Rogers reported the incident to Dr. Renfrew, who told Dr. Stulc he was never to do that again. DSMF ¶ 89; PODSMF ¶ 89. At Ms. Rogers'

---

[26] Redington-Fairview raised an evidentiary objection to Plaintiff's additional material fact paragraph 287. DRPSAMF ¶ 287. The Court overrules the Hospital's objection.

recommendation, Redington-Fairview prepared a Patient Event Reporting and Tracking System (PERTS) report regarding the incident. DSMF ¶¶ 90–91; PODSMF ¶¶ 90–91. A PERTS report is a system in place at Redington-Fairview to document, report, trend, and handle unexpected events or events that could have happened. DSMF ¶ 91; PODSMF ¶ 91. The PERTS report did not address sexual misconduct, but addressed the doctor's failure to properly glove himself during the examination. DSMF ¶ 92; PODSMF ¶ 92. According to Redington-Fairview policy, a PERTS report, like the one involving Dr. Stulc, does not warrant administrative leave, disciplinary action, or termination.[27] PSAMF ¶¶ 312–14; DRPSAMF ¶¶ 312–14.

Ms. Daigle viewed the incident as sexual abuse. PSAMF ¶ 289; DRSAMF ¶ 289. She recognized the patient as having been an 18 year old female, the same patient whose buttocks Dr. Stolc had patted in the office. PSAMF ¶ 289; DRSAMF ¶ 289. These incidents made Ms. Daigle fear allowing Dr. Stulc to examine female patients.[28] PSAMF ¶ 292; DRPSAMF ¶ 292. At no time did Redington-Fairview notify the patient who was the subject of the PERTS report. PSAMF ¶¶ 307, 311;

_____

[27] Ms. Daigle asserts that under Redington-Fairview policy, the conduct underlying the PERTS report did not warrant administrative leave, discipline, or termination. PSAMF ¶¶ 312–14. Redington-Fairview posited a qualified response, noting that the record support—deposition testimony of Mr. Willett—was that a PERTS report in general did not warrant such action. DRPSAMF ¶¶ 312–14. The Court has reviewed the cited deposition testimony of Mr. Willett and concludes it is unclear whether he was saying that the conduct underlying the PERTS report in Dr. Stulc's case did not warrant administrative action against the doctor or saying that PERTS reports in general never trigger administrative action against physicians. The Court has therefore quoted the actual question to which Mr. Willett responded.

[28] Redington-Fairview objects to this statement on the ground that because Dr. Stulc never worked at the Hospital after November 21, 2007, Ms. Daigle could not have been placed in such fear. DRPSAMF ¶ 292. The Court overrules the Hospital's objection. Ms. Daigle could not have known as of November 21, 2007 whether Dr. Stulc was going to be allowed to remain on the Redington-Fairview Medical Staff and whether, if he left, he would be allowed to return.

DRSAMF ¶¶ 307, 311. Redington-Fairview did not notify the National Practitioners Data Bank or state authorities about the events underlying the PERTS report; it did later report Dr. Stulc to the Maine Board of Licensure in Medicine. PSAMF ¶¶ 308–10; DRPSAMF ¶¶ 308–10.

If a nurse at Redington-Fairview has a sexual harassment complaint, the Hospital protocol dictates that she would go to her direct supervisor, who would then contact Deborah Buckingham, the Director of Human Resources. PSAMF ¶ 320; DRPSAMF ¶ 320. Ms. Buckingham was not made aware of the PERTS report against Dr. Stulc.[29] PSAMF ¶ 322; DRPSAMF ¶ 322.

### k. November 21, 2007: Pornographic Images and the Hospital's Response

On November 21, 2007, Ms. Daigle saw inappropriate images of naked women on Dr. Stulc's computer at the general surgery office. DSMF ¶ 65; PODSMF ¶ 65. Specifically, when she arrived at work at 8:00 a.m., she was required to download dictation from Dr. Stulc from the previous day that was on his computer. PSAMF ¶ 254; DRPSAMF ¶ 254. When she moved the mouse, an image appeared

---

[29] Plaintiff's additional material fact paragraph 322 states:

> Deborah Buckingham was not made aware of the PERTS report against Dr. Stulc for sexual misconduct, despite the fact that two nurses felt he had "violated" the young female patient in their presence, which made them uncomfortable.

PSAMF ¶ 322. Redington-Fairview objected on the ground that the statement is not supported by the record reference. DRPSAMF ¶ 322. The Court agrees with Redington-Fairview. The cited testimony from Ms. Buckingham is:

> Q. Okay. Were you made aware of a PERT's report against Dr. Stulc?
> A. No, I was not.

DSMF Attach. 3, *Dep. of Deborah Buckingham* at 26:4–6. The Court limited the statement to the contents of the cited record evidence. The remainder of Plaintiff's additional material fact paragraph 322 is argument.

on the screen that showed a woman clad only in a johnny gown, sitting on a table under the caption, "Casual Sex." PSAMF ¶ 254; DRPSAMF ¶ 254. Recalling the "zero tolerance" directive, she called Mr. Leadbetter and asked him to come to the office. PSAMF ¶ 254; DRPSAMF ¶ 254. Mr. Leadbetter observed this image and when he scrolled down the side of the screen, there were several images of nude women and pornography. PSAMF ¶ 254; DRPSAMF ¶ 254.

After Mr. Leadbetter viewed the images, he quickly called the Hospital and told Ms. Daigle and Ms. Gagnon to lock the door and meet him there. DSMF ¶ 68; PODSMF ¶ 68. Ms. Daigle and Ms. Gagnon met Mr. Leadbetter, Ms. Buckingham, Mr. Kempton, and Mr. Willett in Mr. Willett's office the same day. DSMF ¶ 69; PODSMF ¶ 69. At this meeting, Ms. Daigle and Ms. Gagnon not only reported that Dr. Stulc had been looking at pornography on his computer but also voiced concerns about his interactions with patients. DSMF ¶ 70; PODSMF ¶ 70. They mentioned that while Dr. Stulc was in his office viewing pornography, he was making patients wait for long periods of time. PSAMF ¶ 254; DRPSAMF ¶ 254.

During this November 21, 2007 meeting, Ms. Daigle and Ms. Gagnon reported that things had been going well up to approximately one week before this meeting.[30] DSMF ¶ 71; PODSMF ¶ 71. Ms. Gagnon and Ms. Daigle were asked if

---

[30] Defendant's material fact paragraph 71 contains what must be a typographical error, referring to a November 21, 2010 meeting. DSMF ¶ 71. The Court assumes the reference is to the November 21, 2007 meeting and has amended the paragraph. Redington-Fairview supported this statement with a record reference to Mr. Kempton's deposition. The actual testimony from Mr. Kempton was that "they," not Ms. Daigle alone, had reported that "things had been going well up until like a week before." DSMF Attach. 2, *Dep. of Dana Kempton* at 19:21–20:1 (Docket # 64). To be accurate, the Court amended the paragraph to reflect Mr. Kempton's actual testimony. Ms. Daigle denied this statement, pointing to Kempton Exhibits 7–8 and Mr. Kempton's deposition at page 81, line 19 through page 84, line 12. PODSMF ¶ 71. The cited portion of the Kempton deposition is

they would meet with a counselor who had seen Dr. Stulc after the first reported incident, and they agreed to do so. PSAMF ¶ 255; DRPSAMF ¶ 255. Mr. Willett told Ms. Gagnon and Ms. Daigle not to "jump ship" and that they would address the situation, and Ms. Gagnon and Ms. Daigle agreed to finish out the day so that patients who had scheduled appointments could be seen. DSMF ¶¶ 72–73; PODSMF ¶¶ 72–73. Dr. Stulc remained in the office the rest of the day, seeing patients; the parties disagree as to whether this was the last day he worked at Redington-Fairview.[31]  DSMF ¶¶ 74–75; PODSMF ¶¶ 74–75. On Monday, November 26, 2007, Redington-Fairview placed Dr. Stulc on administrative leave and prohibited him from returning to the general surgery office. DSMF ¶ 81; PODSMF ¶ 81. When it placed Dr. Stulc on administrative leave, Redington-Fairview did not inform the Maine Board of Licensure in Medicine of that fact. PSAMF ¶ 315; DRPSAMF ¶ 315.

## l.  Dr. Stulc's Administrative Leave

After Redington-Fairview placed Dr. Stulc on administrative leave, Mr. Kempton had the Redington-Fairview Director of Information Technology remove

---

indecipherable. The Kempton deposition exhibits imply that Ms. Daigle's and Ms. Gagnon's problems with Dr. Stulc had started before the week before November 21, 2007 but do not contradict Mr. Kempton's assertion that the two women told him at the November 21, 2007 meeting that things had been going well until about a week before. The Court deems Redington-Fairview's material fact paragraph 71 admitted.

[31] Redington-Fairview says that November 21, 2007 was the last day Dr. Stulc worked there. DSMF ¶ 75. The Hospital says that the office was closed on November 22 and 23 for Thanksgiving and that he was placed on administrative leave on November 26, 2007, the next day he was scheduled to work. DSMF ¶ 77. Ms. Daigle says that she believes he performed surgery on November 26, 2007. PODSMF ¶ 75. Redington-Fairview objects to Ms. Daigle's qualified response on the ground that Ms. Daigle's qualified response failed to make a record citation in accordance with Local Rule 56(c). DRPOSMF at 5. Redington-Fairview is correct; nevertheless, since whether Dr. Stulc left the Hospital on Wednesday November 21 or Monday November 26, 2007 is not decisive, the Court has included reference to both positions.

the computer from Dr. Stulc's office and bring it to his office. DSMF ¶ 93; PODSMF ¶ 93. During the week of November 26, 2007, Mr. Kempton viewed nude images on Dr. Stulc's computer but no pornography. DSMF ¶ 94; PODSMF ¶ 94. After Ms. Daigle's and Ms. Gagnon's complaints and after viewing the second batch of sexual images, Mr. Kempton conducted no further investigation and concluded that Dr. Stulc's conduct had been unprofessional. PSAMF ¶¶ 278–279; DRPSAMF ¶¶ 278–279. Mr. Kempton learned that to bring Dr. Stulc back to Redington-Fairview, Dr. Stulc would have to have a mentor, would have to make full disclosure to the entire medical community, and would have to maintain constant counseling. PSAMF ¶ 280; DRPSAMF ¶ 280.

Although Ms. Daigle never observed the scope of the sexual images on Dr. Stulc's computer, the Redington-Fairview forensic investigation of the computer revealed numerous additional images of naked women, resulting in a discovery document that showed about four images of naked women on every page of an 847 page exhibit. PSAMF ¶ 263; DRPSAMF ¶ 263.

On November 26, 2007, Ms. Daigle and Ms. Gagnon met separately with Phil Smith, Ph.D., a clinical psychologist, and told him about their experiences with Dr. Stulc. [32] PSAMF ¶ 256; DRPSAMF ¶ 256. Dr. Smith told Ms. Daigle that no one should be subjected to such behavior and it would be his recommendation to Redington-Fairview to immediately remove Dr. Stulc from the Hospital. PSAMF ¶

---

[32] Redington-Fairview objected to the portion of Plaintiff's additional material facts paragraph 256 that described what she told Dr. Smith on the ground that Ms. Daigle did not have the requisite personal knowledge to make the statements. DRPSAMF ¶ 256. The Court overrules the objection. The information Ms. Daigle gave to Dr. Smith is not received for the truth, but to explain Dr. Smith's response.

256; DRPSAMF ¶ 256.

As of November 26, 2007, Redington-Fairview would have had the contractual right to terminate Dr. Stulc's employment contract. PSAMF ¶¶ 274, 316; DRPSAMF ¶¶ 274, 316. Instead of terminating Dr. Stulc at that point, Redington-Fairview consulted with the group within the Maine Medical Association that deals with impaired physicians. PSAMF ¶ 275; DRPSAMF ¶ 275. After consulting a psychologist and the Maine Medical Association's Physician's Health Program, Mr. Willett and Mr. Kempton urged Dr. Stulc to enroll in a treatment program in Kansas City, Missouri and Dr. Stulc attended the recommended program.[33] DSMF ¶¶ 95–97; PODSMF ¶¶ 95–97. Redington-Fairview management made it clear to Dr. Stulc that any chance of continued employment at the Hospital depended on his enrolling in such a program, but they did not guarantee his continued employment if he decided to attend. PSAMF ¶ 276; DRPSAMF ¶ 276. During this period, Redington-Fairview placed Dr. Stulc on paid leave. PSAMF ¶ 317; DRPSAMF ¶ 317.

Although Redington-Fairview management thought there was something wrong with Dr. Stulc, they never received a formal diagnosis from him. PSAMF ¶ 265; DRPSAMF ¶ 265. During the time that Redington-Fairview was considering allowing Dr. Stulc to return, the Hospital took into account that he was a gifted surgeon, that it was unusual to recruit a surgeon with such gifts to a rural hospital,

---

[33] Redington-Fairview posited that "Dr. Stulc attended a treatment program in Kansas City, Missouri." DSMF ¶ 97. Ms. Daigle's response was solely: "Not admissible, hearsay." PODSMF ¶ 97. In positing this fact, Redington-Fairview cited the deposition testimony of Dana Kempton, who testified that he had conferred with the director of the clinic and confirmed that Dr. Stulc was attending. DSMF ¶ 97. The Court overrules Ms. Daigle's objection.

that it might be worth the time and expense to give him the chance to turn the situation around, but that to do so would require mentoring, disclosure, and counseling. PSAMF ¶ 281; DRPSAMF ¶ 281. Redington-Fairview never formally determined whether to bring Dr. Stulc back since through Ms. Daigle, it learned information about his employment at Trover Regional Medical Center ("Trover"), where Dr., Stulc had previously worked, that caused the Medical Staff to reevaluate its initial credentialing of Dr. Stulc. DSMF ¶ 106; PODSMF ¶ 106; PSAMF ¶ 283; DRPSAMF ¶ 283.

During Dr. Stulc's administrative leave, the Hospital informed Ms. Daigle that the doctor was "unavailable."[34] DSMF ¶ 98; PODSMF ¶ 98. After Dr. Stulc left in November, 2007 until February 2008, locum tenens surgeons worked in the general surgery office and during this time, things progressed smoothly. DSMF ¶¶ 103–04; PODSMF ¶¶ 103–04.

### m. Events Leading to Dr. Stulc's Resignation

On approximately January 28, 2008, Deborah Buckingham received a letter from Daniel Bates, attorney for Ms. Daigle, advising her that he had filed a charge of sexual harassment on Ms. Daigle's behalf against the Hospital. DSMF ¶ 106; PODSMF ¶ 106. Mr. Bates enclosed documents he had received from Trover reflecting problems Dr. Stulc had experienced there. DSMF ¶ 106; PODSMF ¶ 106. Ms. Buckingham shared the Trover attachment with Mr. Willett; they were each

---

[34] Redington-Fairview says it informed Ms. Daigle that Dr. Stulc had been placed on administrative leave. DSMF ¶ 98. Ms. Daigle denies this and says that she was only told he was "unavailable" and more particularly, was never informed whether he might be returning to work. PODSMF ¶ 98. The Court has recounted the facts in the light most favorable to Ms. Daigle.

disturbed about this new information. DSMF ¶¶ 108–09; PODSMF ¶¶ 108–09. Although Dr. Stulc had not yet resigned from the Medical Staff at Redington-Fairview, he was no longer practicing there. DSMF ¶ 113; PODSMF ¶ 113.

After reviewing the Trover documents, Mr. Willett became concerned about whether Dr. Stulc had been forthright in his Redington-Fairview application for privileges. DSMF ¶ 114; PODSMF ¶ 114. Dr. Renfrew submitted a request to the President of the Redington-Fairview Medical Staff to appoint an ad hoc committee to investigate the matter, and the President of the Medical Staff appointed an ad hoc committee. DSMF ¶¶ 120–21; PODSMF ¶¶ 120–21. The ad hoc committee met a few times in March 2008, both before and after meeting Dr. Stulc, but on April 17, 2008, before the Medical Staff made a recommendation, Dr. Stulc resigned his Medical Staff membership and Hospital privileges at Redington-Fairview, an act that also terminated his Hospital employment. DSMF ¶¶ 121–22, 125; PODSMF ¶¶ 121–22, 125. On August 4, 2009, Redington-Fairview reported Dr. Stulc's voluntary resignation to the Maine Board of Licensure in Medicine, referring specifically to the fact that he resigned while under investigation for a failure to be forthright in his application for Medical Staff membership.[35] PSAMF ¶ 303;

---

[35] The parties disagree about whether Redington-Fairview reported the necessary information about Dr. Stulc to the appropriate authorities. PSAMF ¶ 303; DRPSAMF ¶ 303. Even viewing the evidence in the light most favorable to Ms. Daigle, the record is not sufficient for the Court to include a statement about the Hospital's compliance with the Health Care Quality Improvement Act and its implementing regulations. The Court has set forth what appears as a matter of record on this point. The parties also disagree about whether Dr. Stulc applied for a license to practice medicine in the commonwealth of Massachusetts. PSAMF ¶ 304, 470; DRPSAMF ¶ 304, 470. Although Ms. Daigle asserts he did so, the Court cannot conclude that this is correct based on the cited evidence. Ms. Daigle points first to portions of Mr. Kempton's deposition that do not confirm the Massachusetts application. She then references a deposition exhibit to Mr. Kempton's deposition. *Kempton Dep. Ex. 11.* The exhibit is a Maine Board of Licensure of Medicine form, which was notarized in

DRPSAMF ¶ 303.

### n.    Post-November 26, 2007 Hostility Against Tanya Daigle

After Redington-Fairview placed Dr. Stulc on administrative leave, Ms. Daigle was told he was on administrative leave but to tell patients only that he was "unavailable."[36]  PSAMF ¶¶ 323–26; DRPSAMF ¶¶ 323–26.  Redington-Fairview's failure to inform Ms. Daigle that Dr. Stulc had been discharged or would not otherwise return to the Hospital caused Ms. Daigle concern because if Dr. Stulc returned, she was worried how he would react to her reporting on him and how she

---

Massachusetts.  The exhibit does not support the contention that Dr. Stulc applied for a license to practice medicine in Massachusetts.

[36] The parties dispute whether the Hospital told Ms. Daigle that Dr. Stulc was on administrative leave.  PSAMF ¶ 323; DRPSAMF ¶ 323.  Citing Mr. Willett's testimony, Ms. Daigle contends she was only told that he was "unavailable."  PSAMF ¶ 323 (citing DSMF Attach. 1 (*Willett Dep.*) at 64:23–67:7).  Mr. Willett testified that Ms. Daigle contacted him and asked him what she should tell patients about Dr. Stulc and Mr. Willett told her to tell patients only that Dr. Stulc was "unavailable."  *Willett Dep.* at 65:5–9.  He confirmed that all that was said to Ms. Daigle was that Dr. Stulc was "unavailable."  *Id.* at 66:20–25.  However, he also said that he was not aware what Mr. Leadbetter might have told Ms. Daigle.  *Id.* at 67:1–7.  This testimony seems to justify Ms. Daigle's assertion that she was only told that Dr. Stulc was "unavailable."  However, as Redington-Fairview points out, Ms. Daigle's position contradicts her own testimony.  DRPSAMF ¶ 323 (citing DSMF Attach. 10, *Dep. of Tanya Daigle* at 69:1–12).  In her testimony, Ms. Daigle acknowledged that she knew Dr. Stulc was on administrative leave:

> Q.  Did Mr. Leadbetter talk to you at all about the photos or the situation at any time after that day?
> A.  Nope.  They just said that they would be addressing it and that we were to tell people that he - - Dr. Stulc was temporarily unavailable.
> Q.  And was it your understanding that Dr. Stulc was on some sort of leave at that time?
> A.  Yes.
> Q.  Had you been told he was on an administrative leave?
> A.  Yes.

*Daigle Dep.* at 69:1–12.  The Court takes Ms. Daigle at her word and views the Plaintiff's contention that she only knew that Dr. Stulc was unavailable, not that he was on administrative leave, as an attempt to generate an issue where none exists.  Ms. Daigle's overall contention—that she did not know whether Dr. Stulc would return—remains valid either way.

would react to his renewed examinations of female patients.[37]   PSAMF ¶ 327;

DRPSAMF ¶ 327.  During the time between November 26, 2007 and April 17, 2008,

Dr. Stulc's personal items remained in his office, within the office Ms. Daigle

managed, again leading her to believe that he would be returning to work in her

office.  PSAMF ¶ 328; DRPSAMF ¶ 328.  The fact that Redington-Fairview had not

discharged Dr. Stulc for his sexual misconduct and for his treatment of employees

and patients and the thought that he might be coming back to work and carry out

threats against Ms. Daigle and her job, caused her such anxiety that she went to

her primary care physician, Dr. Lanoi, who is a Redington-Fairview employee, and

he prescribed anti-anxiety medication for her and told her to see a counselor.[38]

PSAMF ¶ 329; DRPSAMF ¶ 329.  Ms. Daigle began to see a counselor in December

2007 and her complaint to the counselor was that her nerves were in terrible shape

because she did not know when Dr. Stulc would be returning and could not believe

that Redington-Fairview had not fired him for all his misconduct.   PSAMF ¶ 329;

DRPSAMF ¶ 329.

   In November or December 2007, Redington-Fairview hired Jessica Campbell

to assist the office where Ms. Daigle and Ms. Gagnon worked.   PSAMF ¶ 330;

DRPSAMF ¶ 330.  After her five-week performance review by Mr. Leadbetter in

---

[37] Ms. Daigle has posited paragraph 327 in an argumentative fashion, contending that these facts amount to the continuation of a hostile work environment for her.  PSAMF ¶ 327.  The Hospital has properly objected on the ground that the statement is a conclusory argument, not a statement of fact. DRPSAMF ¶ 327.  The Court sustains the Hospital's objection to an extent.  Instead, the Court has rewritten the statement to reflect Ms. Daigle's stated concern about Dr. Stulc's potential return, which is important to her defense of this motion, and is consistent with her supporting affidavit.  *See Aff. of Tanya Daigle* ¶ 79 (Docket # 72).

[38] Redington-Fairview denied the first portion of this statement on the ground that it is in the nature of argument, not a statement of facts.  DRPSAMF ¶ 329.  The Court disagrees, overrules the Hospital's objection, and treats the paragraph as admitted for purposes of the motion.

late December 2007 or early January 2008, Ms. Campbell returned shaken and annoyed.[39]  PSAMF ¶ 330; DRPSAMF ¶ 330.  She informed Ms. Daigle that Mr. Leadbetter had questioned her about both Ms. Daigle and Ms. Gagnon and specifically asked her about what they had told her about Dr. Stulc.  PSAMF ¶ 330; DRPSAMF ¶ 330.  Ms. Campbell responded that they had only told her that Dr. Stulc was not available.  PSAMF ¶ 331; DRPSAMF ¶ 331.  He also asked whether Ms. Daigle had ever made her feel intimidated.  PSAMF ¶ 330; DRPSAMF ¶ 330.  Ms. Campbell told Mr. Leadbetter that Ms. Daigle had not made her feel intimidated.  PSAMF ¶ 331; DRPSAMF ¶ 331.  Ms. Daigle believed that during his performance evaluation of Ms. Campbell, Mr. Leadbetter was seeking information to use against her.  PSAMF ¶ 330; DRPSAMF ¶ 330.

After January 2008, Ms. Daigle's mental distress and trauma were such that, every morning at work, she checked the internet to see whether Dr. Stulc was still licensed to practice medicine in the state of Maine, concerned that he might return to the Hospital, renew his unwelcome and hostile conduct and cause her employer to act against her.[40]  PSAMF ¶ 332; DRPSAMF ¶ 332.  From January 2008 until her termination on November 12, 2008, the internet indicated that Dr. Stulc retained his license to practice medicine in the state of Maine, a fact that caused Ms. Daigle

---

[39]  Redington-Fairview moved to strike this and other statements in Plaintiff's additional material facts paragraphs 330 and 331.  DRPSAMF ¶¶ 330–31.  The Court denies the Hospital's motions to strike in part.  What Ms. Campbell told Ms. Daigle about Mr. Leadbetter's performance evaluation is not admissible for the truth but for the impact it had on Ms. Daigle.  The Court strikes the last sentence of Plaintiff's additional material fact paragraph 331 as argument, not fact.

[40]  Redington-Fairview denied this paragraph and moved to strike it on the ground that it is argument, not fact.  DRPSAMF ¶ 332.  The Court denies the Hospital's motion to strike and considered its denial of Ms. Daigle's paragraph not to be in good faith.  The Court deems the statement in paragraph 332 of Plaintiff's additional material facts admitted.

continuing stress, anxiety, and fear.[41]  PSAMF ¶ 333; DRPSAMF ¶ 333.  Following

the incident involving Jane Doe, Ms. Daigle experienced distress, anxiety, and

mental anguish from the prospect of having to place female patients in positions of

vulnerability and peril.[42]  PSAMF ¶ 335; DRPSAMF ¶ 335.[43]  In June 2009, the

internet confirmed that Dr. Stulc's license to practice medicine in the state of Maine

was suspended or revoked.  PSAMF ¶ 365; DRPSAMF ¶ 365.

### o.    Redington-Fairview Warns Tanya Daigle

After November 26, 2007, when Redington-Fairview placed Dr. Stulc on

administrative leave, Ms. Daigle and Ms. Gagnon were moving supplies to a closet

---

[41]  Redington-Fairview denied Ms. Daigle's additional material fact paragraph 333 and moved to strike on the ground that it is argument, not fact, and on the additional ground that what the internet may have said is inadmissible hearsay.  DRPSAMF ¶ 333.  The Court strikes so much of paragraph 333 as states as a fact that Ms. Daigle's discharge was wrongful and pretextual on the ground that these statements are argument, not fact.  The Court denies the Hospital's motion to strike what the internet revealed.  The statement is not offered for the truth but for its impact on Ms. Daigle.  The Court deems the statement about what the internet showed to have been admitted. Redington-Fairview also moved to strike paragraph 334 on the ground that it is argument, not fact. The Court agrees and strikes Plaintiff's Statement of Additional Material Fact paragraph 334.

[42] Redington-Fairview denied this statement and moved to strike it based on Ms. Daigle's description of Dr. Stulc's examination as an assault.  DRPSAMF ¶ 335.  The Court agrees that the description of Dr. Stulc's examination as an assault is in the nature of argument, not a factual contention, and strikes that portion of the statement.  However, the remainder of the statement is proper and, viewed in the light most favorable to Ms. Daigle, the Court accepts the statements for purposes of this motion.

[43] Plaintiff's Statement of Material Fact paragraph 336 reads:

> After Plaintiff's internal Complaints against Stulc, her complaint to the Board of Licensure in Medicine, her Charge with the Maine Human Rights Commission and EEOC, [Redington-Fairview] retaliated against her by creating sustained hostility towards her, ostracization, stripping her of her job duties as office manager, disciplining her by a warning that had no basis in fact nor in the policies of [the Hospital] and ultimately discharging Ms. Daigle from employment and engaging in dishonesty in order to deprive her of her rights under the Unemployment Compensation Statutes of the State of Maine.

PSAMF ¶ 336.  Ms. Daigle cites as record support her own affidavit, which tracks this statement.  *Id.* (citing *Daigle Aff.* ¶ 159).  Redington-Fairview objects on the ground that paragraph 336 is argument, not fact.  The Court agrees with Redington-Fairview.  The Court strikes Plaintiff's Statement of Additional Material Fact paragraph 336 in its entirety.

and came across several boxes of paperwork and medical manuals and books.[44] DSMF ¶ 126; PODSMF ¶ 126. There was an open box in the closet with papers strewn both inside and outside the box in plain view. PSAMF ¶ 337; DRPSAMF ¶ 337. As Ms. Daigle began organizing the material, she observed that some documents mentioned issues Dr. Stulc had with Trover. DSMF ¶¶ 127–28; PODSMF ¶¶ 127–28. Specifically, the documents revealed that while Dr. Stulc was at Trover, he had preyed upon female patients and employees, had created a sexually hostile environment for females, and engaged in sexual and discriminatory misconduct that required Trover twice to suspend his Medical Staff privileges and finally to terminate him.[45] PSAMF ¶ 337; DRPSAMF ¶ 337.

Ms. Daigle retrieved and photocopied certain documents, including the Trover Hospital documents, including assertions that Dr. Stulc had engaged in inappropriate behavior at Trover. DSMF ¶ 128; PODSMF ¶ 128. Ms. Daigle gave copies of these documents to her attorney without initially telling the Hospital administration about them. Ms. Daigle and Ms. Gagnon agreed that Ms. Daigle should seek legal counsel because they feared for their jobs if they reported this

---

[44] In her additional material fact paragraph 337, Ms. Daigle claims she was asked to clean out the closet where she found Dr. Stulc's personal papers. PSAMF ¶ 337. Redington-Fairview objects, pointing out that Ms. Daigle testified she was asked to move supplies into that closet. DRPSAMF ¶ 337. The Court reviewed Ms. Daigle's testimony on this point. *Daigle Dep.* 85:16–22. The Court agrees with Redington-Fairview that Ms. Daigle testified she was asked to move supplies into the closet, although it is also logical to infer that if—as Ms. Daigle claimed—the closet was a mess, she would be also required to clean it up before storing supplies there. The Court overrules Redington-Fairview's objection.

[45] Redington-Fairview moves to strike and denies this paragraph on evidentiary grounds. DRPSAMF ¶ 337. The Court denies the Hospital's motion to strike and deems the paragraph admitted.

additional wrongdoing to the Redington-Fairview administration.[46] PSAMF ¶ 338; DRPSAMF ¶ 338. Ms. Daigle also reviewed the Hospital's Confidentiality Policy and concluded that it did not apply to these documents since the documents did not refer to any Redington-Fairview patients or any Redington-Fairview proprietary information.[47] PSAMF ¶¶ 339–40; DRPSAMF ¶¶ 339–40. Her attorney also reviewed the Redington-Fairview Confidentiality Policies and concluded providing the documents to the Maine Board of Licensure in Medicine would not violate any Redington-Fairview policies.[48] PSAMF ¶ 341; DRPSAMF ¶ 341.

Her attorney later provided the documents to Redington-Fairview, and on February 6, 2008, Ms. Daigle, through her attorney, notified Redington-Fairview that she disclosed the Stulc information to the Maine Board of Licensure in Medicine "pursuant to the immunities and protections of 42 U.S.C. § 11111(a)(2) and 24 M.R.S.A. §§ 2505 and 2511." DSMF ¶¶ 129–30; PODSMF ¶¶ 129–30; PSAMF ¶ 368; DRPSAMF ¶ 368. In the February 6, 2008 letter, Ms. Daigle's attorney quoted a provision in Dr. Stulc's application to the Maine Board of

---

[46] Redington-Fairview denied this statement based on other testimony in Ms. Daigle's deposition, which it contends contradicts this statement. DRPSAMF ¶ 338. The Court reviewed the other testimony and concludes it does not clearly contradict this statement. Accordingly, the Court deems this paragraph admitted.

[47] Redington-Fairview moved to strike and denied the statement in paragraph 339 on the ground that Ms. Daigle is not competent to interpret the Hospital's Confidentiality Policy. DRPSAMF ¶ 339. Ms. Daigle is not claiming, however, that her interpretation of the Confidentiality Policy was definitive. She is only explaining why she handed over the documents to her attorney. The Court denies the Hospital's motion to strike and deems this paragraph to have been admitted.

[48] Redington-Fairview moves to strike this paragraph and denies it on the ground that it is inadmissible hearsay. DRPSAMF ¶ 341. The Court disagrees and denies the motion to strike and deems the paragraph admitted. The paragraph is not being considered for its truth but to explain Ms. Daigle's conduct.

Licensure in Medicine that authorized the release of his information to the Board.[49] PSAMF ¶ 369; DRPSAMF ¶ 369. In Dr. Stulc's application to the Maine Board of Licensure in Medicine, he swore out a statement that affirmed that if he furnished any false information in the application, such act shall constitute cause for denial, suspension or revocation of his license to practice medicine and surgery in the state of Maine.[50] PSAMF ¶ 371; DRPSAMF ¶ 371.

Ms. Daigle's attorney reviewed these documents, Dr. Stulc's application for medical licensure in the state of Maine, and certain laws establishing a privilege for filing a complaint against a doctor who had obtained his state of Maine medical license by fraud or perjury. PSAMF ¶ 342; DRPSAMF ¶ 342. Ms. Daigle's attorney advised her that (1) from his review of Dr. Stulc's application to practice medicine in Maine, combined with the documents showing the suspensions for sexual misconduct and anger-related misconduct against employees and patients at Trover, Dr. Stulc had lied to obtain his license to practice medicine in Maine; (2) that Dr. Stulc had waived his rights to any hospital that offered him a position or that was considering doing so; and that (3) both state and federal law protected people who reported doctors who had acted inappropriately to the Board of

---

[49] Redington-Fairview denies and moves to strike Plaintiff's additional material fact paragraph 370 on the ground that it is argument, not fact. DRPSAMF ¶ 370. The Court agrees and strikes Plaintiff's additional material fact paragraph 370. The statement says that Ms. Daigle's attorney provided Redington-Fairview with evidence that Dr. Stulc lied in this application to the Maine Board of Licensure in Medicine. PSAMF ¶ 370. But it does not say what that evidence was. As such, the statement is not evidence but a view of the significance of the evidence; in effect, argument.

[50] Redington-Fairview objects on foundational grounds to this paragraph. DRPSAMF ¶ 371. The Court overrules that objection. Redington-Fairview objects to the second sentence of Plaintiff's additional material fact paragraph 371 on the ground that it is argumentative. *Id.*; PSAMF ¶ 371. The Court sustains the Hospital's objection to the second sentence of Plaintiff's additional material fact paragraph 371 and strikes that sentence.

Licensure of Medicine.[51]   PSAMF ¶ 343; DRPSAMF ¶ 343.

Ms. Buckingham and Mr. Leadbetter met with Ms. Daigle to discuss the fact she had retrieved, copied, and removed documents from the Hospital without informing management.[52]   DSMF ¶ 131; PODSMF ¶ 131.   On February 18, 2008, the Hospital issued Ms. Daigle a written warning because she went through Dr. Stulc's personal belongings without authority, copied sensitive documents, and removed them from the Hospital without notifying the Hospital administration. DSMF ¶ 132; PODSMF ¶ 132.   On February 20, 2008, Redington-Fairview issued the annual performance evaluation for Ms. Daigle and she received a generally favorable evaluation, except for two criteria involving confidentiality based on her handling of Dr. Stulc's documents.[53]   DSMF ¶ 137; PODSMF ¶ 137.

Ms. Daigle considers Redington-Fairview's actions in imposing discipline against her to be false and contrived.[54]   PSAMF ¶ 353; DRPSAMF ¶ 353.   She

---

[51]Redington-Fairview moves to strike this statement and denies it on the ground that it is inadmissible hearsay.  DRPSAMF ¶ 343.  The Court disagrees and denies the motion to strike and deems the statement admitted.  The statement is not being considered for its truth but to explain Ms. Daigle's conduct.

[52] Redington-Fairview moves to strike three sentences in Plaintiff's additional material fact paragraph 372 on the ground that they are argumentative.  DRPSAMF ¶ 372; PSAMF ¶ 372.  The Court agrees and strikes those three sentences.  Once those three sentences are struck, the remaining sentence that Redington-Fairview has no context and the Court has not included it.

[53] Redington-Fairview denied Plaintiff's additional material fact paragraph 404 as not supported by the record citation.  PSAMF ¶ 404; DRPSAMF ¶ 404.  In paragraph 404, Ms. Daigle asserts that the "finding of the Stulc information was the only reason for Deborah Buckingham giving Tanya Daigle two 'not met' grades on her performance evaluation."  PSAMF ¶ 404.  The Court agrees with the Hospital that this paragraph does not properly characterize Ms. Buckingham's testimony.  Ms. Buckingham did not testify that the only reason she gave Ms. Daigle two not met grades was that she found the Stulc material.  She testified that the reason she gave Ms. Daigle the two not met grades is what Ms. Daigle did with the material after she found it.  The Court strikes Plaintiff's additional material fact paragraph 404.

[54] Redington-Fairview denied and moved to strike this paragraph and the statement in paragraph 354 as phrased.  DRPSAMF ¶ 353.  The Court agrees with Redington-Fairview that Ms. Daigle has stated her legal contentions as facts.  At the same time, the Court views the statement as Ms. Daigle's perception of the discipline against her that Redington-Fairview imposed and her perception

contends that Dr. Stulc had no privacy rights to these documents and that Redington-Fairview's discipline of her on that basis was pretextual and contrived. PSAMF ¶ 354; DRPSAMF ¶ 354. The Hospital acknowledges that but for Ms. Daigle's bringing the Stulc material to Mr. Willett's attention, he would not have known about Dr. Stulc's dishonesty.[55] PSAMF ¶ 395; DRPSAMF ¶ 395. Ms. Buckingham acknowledged that if Ms. Daigle and Ms. Gagnon had not found the Stulc information, she may never have known about it.[56] PSAMF ¶ 405; DRPSAMF ¶ 405. Ms. Daigle told Hospital management that she was only trying to protect the best interest of the hospital in protecting its female patients from Dr. Stulc's sexual misconduct, but Redington-Fairview refused to remove the warning from her personnel file.[57] PSAMF ¶ 356; DRPSAMF ¶ 356.

Mr. Willett, the Hospital CEO, testified that Ms. Daigle was issued a written warning because she did not have any right to go through Dr. Stulc's personal belongings; however, he also said that he would have reported Dr. Stulc to the

---

[55] of the legitimacy of the discipline. The Court has reframed the statement to narrow its permissible impact.

[55] In her additional material fact paragraphs 392 through 394, Ms. Daigle has framed the paragraphs in such an argumentative fashion that they add little to the substance of the motion. PSAMF ¶¶ 392–94. The substance of these facts is, however, found elsewhere and the Court declines to hunt for contested facts hidden in argument.

[56] Redington-Fairview posited a qualified response to Plaintiff's additional material fact paragraph 405 on the ground that it misstates Ms. Buckingham's testimony. PSAMF ¶ 405; DRPSAMF ¶ 405. The Plaintiff says that but for Ms. Daigle's counsel's letter to Ms. Buckingham, the Hospital "never would have found out about Stulc's past misconduct and dishonesty in order to obtain his license to practice medicine." PSAMF ¶ 405. Ms. Buckingham was asked whether "if it [the Stulc information] had not been found by Tanya Daigle and Danielle Gagnon, you may never have known about it, correct?" She answered, "Correct." *Buckingham Dep.* 49:14–17. The Court agrees that the Plaintiff's additional material fact paragraph 405 slightly misstates the record and the Court alters the statement to conform to the testimony.

[57] Redington-Fairview denied and moved to strike the second sentence in Plaintiff's additional material fact paragraph 356 on the ground that it is in the nature of argument. DRPSAMF ¶ 356. The Court agrees and strikes the second sentence of Plaintiff's additional material fact paragraph 356.

Maine Board of Licensure in Medicine if Ms. Daigle had made the Hospital aware of these documents before she reported it.[58]  PSAMF ¶¶ 357, 389; DRPSAMF ¶¶ 357, 389.  Ms. Buckingham also confirmed that if Ms. Daigle had not reported Dr. Stulc to the Board, the Hospital would have done so.[59]  PSAMF ¶ 400; DRPSAMF ¶ 400. Before the Hospital issued the written warning, Mr. Willett never interviewed Ms. Daigle about the circumstances under which she found the Trover documents.[60] PSAMF ¶ 390; DRPSAMF ¶ 390.

Ms. Buckingham admitted that anyone who discovers information should be able to provide it to the Board of Licensure in Medicine if the information shows that a doctor lied to obtain a license to practice medicine.[61]  PSAMF ¶ 408; DRPSAMF ¶ 408.  Ms. Buckingham also acknowledged that if Ms. Daigle had turned over the Stulc information to her, it would have been appropriate for Mr.

---

[58]  Redington-Fairview denied and moved to strike Plaintiff's statement of additional material fact paragraph 358 as not supported by the record citation.  DRPSAMF ¶ 358.  The Court agrees with the Hospital that Ms. Daigle's citation of Mr. Willett's deposition testimony does not support the contents of the statement and that Ms. Daigle's affidavit mischaracterizes his deposition testimony. The Court grants the Hospital's motion to strike Plaintiff's additional material fact paragraph 358. Redington-Fairview qualified its response to Plaintiff's additional material fact paragraph 389. PSAMF ¶ 389; DRPSAMF ¶ 389.  To obviate any controversy, the Court has consulted and used Mr. Willett's actual testimony.

[59]  Redington-Fairview interposed qualified objection to Plaintiff's additional material fact paragraph 400 on the ground that it states that she "reiterated Richard Willett's testimony."  PSAMF ¶ 400; DRPSAMF ¶ 400.  The Court agrees with the Hospital that there is no support for the proposition that Ms. Buckingham was reiterating Mr. Willett's testimony as opposed to offering her own view. The Court strikes that portion of Plaintiff's additional material fact paragraph 400.

[60]  Redington-Fairview qualified its response to Plaintiff's Statement of Material Fact paragraph 390. PSAMF ¶ 390; DRPSAMF ¶ 390.  To obviate any controversy, the Court has consulted and used Mr. Willett's actual testimony.

[61]  Redington-Fairview qualified its response to Plaintiff's additional material fact paragraph 408 on the ground that Ms. Buckingham added that the reporting individual needs to respect the proper reporting steps.  PSAMF ¶ 408; DRPSAMF ¶ 408.  This qualification, however, does not deny the truth of the statement.

Willett to report the information to the Board of Licensure in Medicine.[62]  PSAMF ¶ 409; DRPSAMF ¶ 409.  In fact, Ms. Buckingham "absolutely" agreed that it would have been appropriate for Mr. Willett to have reported the Stulc information to the Board despite the fact it was confidential.[63]  PSAMF ¶ 410; DRPSAMF ¶ 410.  Ms. Buckingham also stated that it was apparent with the information Ms. Daigle found that Dr. Stulc had lied to obtain his license to practice medicine.  PSAMF ¶ 429; DRPSAMF ¶ 429.  Although Ms. Buckingham was thankful that the information about Dr. Stulc was brought to her attention, she never thanked Ms. Daigle for doing so.[64]  PSAMF ¶ 430; DRPSAMF ¶ 430.

In finding the material about Dr. Stulc's prior misconduct and in disclosing the material to the Board of Licensure in Medicine, Ms. Daigle had not violated any written Redington-Fairview policy.[65]  PSAMF ¶¶ 391, 402; DRPSAMF ¶¶ 391, 402. The Redington-Fairview confidentiality policies pertain to patient confidentiality

---

[62] Redington-Fairview makes a technical qualification to Plaintiff's additional material fact paragraph 409.  PSAMF ¶ 409; DRPSAMF ¶ 409.  The qualified response does not contradict the essence of the statement and therefore the Court deems the paragraph admitted.

[63] Redington-Fairview interposed a qualified response to Plaintiff's additional material fact paragraph 410 on the ground that the paragraph did not accurately reflect Ms. Buckingham's testimony.  PSAMF ¶ 410; DRPSAMF ¶ 410.  The Court has reviewed Ms. Buckingham's testimony, which Ms. Daigle cited in support of its material fact, and agrees that the Hospital's qualified response more accurately reflects Ms. Buckingham's testimony and has altered the paragraph to reflect its record support.

[64] Redington-Fairview interposed a qualified response to Plaintiff's additional material fact paragraph 430 on the ground that Ms. Daigle did not bring the information about Dr. Stulc to Ms. Buckingham's attention and that she received the information from Attorney Bates.  DRPSAMF ¶ 430.  However, the paragraph does not assert that Ms. Daigle brought the information to Ms. Buckingham and it accurately reflects Ms. Buckingham's testimony.  PSAMF ¶ 430; *Buckingham Dep.* 70:24–25; 71:1–4.  The Court overrules the qualified objection and deems the paragraph admitted.

[65] Redington-Fairview qualified its response to Plaintiff's additional material fact paragraph 391.  PSAMF ¶ 391; DRPSAMF ¶ 391.  To obviate any controversy, the Court has consulted and used Mr. Willett's actual testimony.

and the confidentiality of hospital records and information.[66]  PSAMF ¶ 399;

DRPSAMF ¶ 399.  Because the materials had to do with Dr. Stulc's tenure at

Trover before he became a Redington-Fairview employee, Ms. Daigle's taking and

photocopying these records did not violate the part of the Redington-Fairview

confidentiality policy dealing with Hospital records.[67]  PSAMF ¶ 401; DRPSAMF ¶

401.  This written warning was listed as a reason for Ms. Daigle's later

termination.[68]  PSAMF ¶ 355; DRPSAMF ¶ 355.  On February 20, 2008, after the

February 18, 2008 written warning, Ms. Buckingham crossed out the word

"orthopedic" and substituted the word "general" to the warning report.  PSAMF ¶

465; DRPSAMF ¶ 465.

### p. Tanya Daigle Files a Complaint with the Board of Registration of Medicine and the Maine Attorney General

On January 25, 2008, based on information in Dr. Stulc's Trover file that she

copied at Redington-Fairview, Ms. Daigle filed a complaint against Dr. Stulc with

the Maine Board of Licensure in Medicine.  DSMF ¶¶ 138–39; PODSMF ¶¶ 138–39.

In the complaint, Ms. Daigle alleged that Dr. Stulc had lied in order to obtain his

---

[66] The parties dispute whether the Redington-Fairview confidentiality policies apply to the type of information in the papers in Dr. Stulc's office closet.  PSAMF ¶ 399; DRPSAMF ¶ 399.  The Court is required to view the facts in the light most favorable to the Plaintiff and assumes for purposes of the motion that the Hospital's confidentiality policy did not extend to Dr. Stulc's records.

[67] Redington-Fairview denied Plaintiff's additional material fact paragraph 401 on the ground that the Hospital policy had to do with patient confidentiality and the cited testimony from Ms. Buckingham did not support the assertion.  PSAMF ¶ 401; DRPSAMF ¶ 401.  The Court views the cited testimony as ambiguous and at this stage the ambiguity favors Ms. Daigle.  The Court deems the paragraph admitted.  By contrast, the Court strikes Plaintiff's additional material fact paragraph 403 as argument, not fact.  PSAMF ¶ 403; DRPSAMF ¶ 403.

[68] Redington-Fairview denied and moved to strike this paragraph as an inaccurate reflection of the personnel documents relating to Ms. Daigle's discharge.  DRPSAMF ¶ 355.  As the Court is required to view the evidence in the light most favorable to Ms. Daigle consistent with record support, the Court denies the Hospital's motion to strike and deems the statement admitted for purposes of this motion.

state of Maine medical license.[69]  PSAMF ¶¶ 344, 449; DRPSAMF ¶¶ 344, 449.  Ms. Daigle filed the complaint to protect Redington-Fairview's female patients and other female patients in the state of Maine.[70]  PSAMF ¶ 345; DRPSAMF ¶ 345.  Before she filed the complaint, Ms. Daigle's attorney had advised her that in reporting Dr. Stulc's misconduct and perjury to the Maine Board of Licensure in Medicine, she was protected by both state and federal law and through her counsel, she informed Redington-Fairview of these protections.  PSAMF ¶ 346; DRPSAMF ¶ 346.

Before she filed the complaint, Ms. Daigle did not inform the Hospital that she was planning to file it or that she had obtained information about Dr. Stulc's employment problems at Trover.  DSMF ¶ 140; PODSMF ¶ 140.  One of the reasons she did not give the Hospital prior knowledge of the complaint is that she was concerned that the Hospital would not pursue the issue with the Maine Board of Licensure in Medicine.[71]  PSAMF ¶ 359; DRPSAMF ¶ 359.  However, Ms. Daigle's

---

[69] Redington-Fairview denied and moved to strike a portion of Plaintiff's additional material fact paragraph 344, which read that the documents "demonstrated that Dr. Stulc had lied in order to obtain his license to practice medicine in the State of Maine, under penalties of perjury."  DRPSAMF ¶ 344; PSAMF ¶ 344.  The Court has adjusted the statement to reflect that this was Ms. Daigle's allegation, not a statement of fact.

[70] Redington-Fairview denied and moved to strike this paragraph on the ground that it is argumentative and lacks foundation.  DRPSAMF ¶ 345.  The Court denies the Hospital's motion to strike and deems the paragraph admitted for purposes of this motion.  The paragraph reflects Ms. Daigle's motivation in filing the complaint and is neither argumentative nor without foundation. Redington-Fairview later denied a companion statement in Plaintiff's additional material fact paragraph 400, which asserted that Ms. Daigle told Ms. Buckingham that the reason she filed the complaint with the Board was for the protection of patients at the Hospital.  PSAMF ¶ 400; DRPSAMF ¶ 400.  The basis of Redington-Fairview's denial of this portion of paragraph 400 is that Ms. Daigle's citation of Ms. Buckingham's testimony does not support the assertion.  The Court has reviewed the cited portion of Ms. Buckingham's testimony and agrees that it does not support the first sentence of Plaintiff's material fact paragraph 400 and the Court strikes the paragraph.

[71] Redington-Fairview denied and moved to strike sentences one and three of Plaintiff's additional material fact paragraph 359 on the ground that they are argument, not facts.  DRPSAMF ¶ 359. The Court agrees with the Hospital and strikes sentences one and three from Plaintiff's additional material fact paragraph 359.

attorney sent Ms. Buckingham a copy of the complaint. PSAMF ¶ 347; DRPSAMF ¶ 347. She also provided the Trover documents to the state of Maine Attorney General for possible prosecution of Dr. Stulc. PSAMF ¶ 349; DRPSAMF ¶ 349.

When she first met with Dennis Smith, the Assistant Attorney General who prosecuted the complaint against Dr. Stulc before the Maine Board of Licensure in Medicine, Ms. Daigle informed him about Ms. Keaney's report of what Ms. Daigle considered to be sexual misconduct in the OR that led to the PERTS report.[72] PSAMF ¶ 350; DRPSAMF ¶ 350. Immediately upon receipt of the Trover documents, the Maine Attorney General's Office prosecuted the revocation of Dr. Stulc's license before the Maine Board of Licensure in Medicine.[73] PSAMF ¶ 352; DRPSAMF ¶ 352.

On May 12, 2009, Dennis Smith, Esq., an Assistant Maine Attorney General

---

Redington-Fairview makes the same objection about Plaintiff's additional material facts paragraphs 360 and 361. The Court agrees with the Hospital and strikes Plaintiff's additional material facts paragraphs 360 and 361.

Redington-Fairview objects to Plaintiff's additional material fact paragraph 362 for the same reason it objected to Plaintiff's additional material fact paragraphs 312–14. *See supra* n.26. The Court sustains the Hospital's objection for the same reason reflected in footnote 26. *Id.*

Redington-Fairview moves to strike Plaintiff's additional material fact paragraph 363 because the Plaintiff's record citation does not support the statement. DRPSAMF ¶ 363. The Court agrees and strikes Plaintiff's additional material fact paragraph 363.

Redington-Fairview moves to strike Plaintiff's additional material fact paragraph 364 because it is argumentative. DRPSAMF ¶ 364. The Court agrees. The paragraph is, in essence, an argumentative summary of facts that appear elsewhere in Plaintiff's additional material facts. The Court strikes Plaintiff's additional material fact paragraph 364.

[72] Redington-Fairview posited a qualified response to Plaintiff's additional material fact paragraph 350, observing that although Ms. Daigle may have told AAG Smith that Dr. Stulc engaged in sexual misconduct in the OR with the young female patient, the Hospital contends that Dr. Stulc's ungloved examination violated standard precautions and infection control procedures and was not a sexual violation. DRPSAMF ¶ 350. Maybe so. However, the Plaintiff's statement reflected what she told the AAG. The Court deems Plaintiff's material fact paragraph 350 admitted.

Redington-Fairview objected to Plaintiff's additional material fact paragraph 351 on the ground that it is an argumentative narrative. DRPSAMF ¶ 351; PSAMF ¶ 351. The Court agrees and strikes Plaintiff's material fact paragraph 351.

[73] Redington-Fairview denied this statement of additional material fact and moved to strike it on the ground that Ms. Daigle lacks personal knowledge for the statement. DRPSAMF ¶ 352. The Court denies the Hospital's motion to strike and deems the statement admitted.

(AAG), presented the case against Dr. Stulc before the Maine Board of Licensure in Medicine. PSAMF ¶¶ 350, 352, 378; DRPSAMF ¶¶ 350, 352, 378. The State alleged that Dr. Stulc had engaged in fraud and deceit in obtaining a permanent license to practice medicine in the state of Maine and in obtaining an emergency license to practice medicine in Maine, that he had engaged in unprofessional conduct and incompetence, had committed violations of the American Medical Association's Principles of Medical Ethics and sexual impropriety, and had made sexually suggestive and sexually demeaning comments to patients.[74] PSAMF ¶ 379; DRPSAMF ¶ 379. The primary components of the State's case against Dr. Stulc were the records Ms. Daigle and Ms. Gagnon found, evidencing numerous suspensions of Dr. Stulc's staff privileges when he was at Trover, Ms. Daigle's, Ms. Gagnon's and Ms. Keaney's testimony about his sexual misconduct at Redington-Fairview, and his lies to the Maine Board of Licensure in Medicine that his license had never been suspended.[75] PSAMF ¶ 380; DRPSAMF ¶ 380. On May 12, 2009, Ms. Daigle testified at length before the Board of Licensure in Medicine concerning her view that Dr. Stulc had created a hostile work environment for women at Redington-Fairview by his numerous sexual improprieties.[76] PSAMF ¶ 381;

---

[74] Redington-Fairview objects to and denies Plaintiff's additional material fact paragraph 379 on the ground that Ms. Daigle has not presented a sufficient foundation for the paragraph. DRPSAMF ¶ 379. The Court overrules the Hospital's objection and deems the paragraph admitted.

[75] Redington-Fairview objects to and denies Plaintiff's material fact paragraph 380 on the ground that Ms. Daigle has not presented a sufficient foundation for the paragraph. DRPSAMF ¶ 380. The Court overrules the Hospital's objection and deems the paragraph admitted.

[76] Redington-Fairview objects to and denies Plaintiff's material fact paragraph 381 on the ground that Ms. Daigle has not presented a sufficient foundation for the paragraph. DRPSAMF ¶ 381. The Court agrees that, as phrased, the statement asserts as a fact a contested matter, namely whether there was a hostile work environment at Redington-Fairview. The Court has altered the assertion to

DRPSAMF ¶ 381. Also on May 12, 2009, Ms. Keaney testified about Dr. Stulc's ungloved examination of the female patient in the OR.[77] PSAMF ¶ 382; DRPSAMF ¶ 382. On June 9, 2009, the Maine Board of Licensure in Medicine unanimously ordered that Dr. Stulc's license be immediately revoked on the basis of fraud, deceit, and his improper conduct toward Ms. Daigle, Ms. Gagnon, and Jane Doe as well as other employees and patients.[78] PSAMF ¶¶ 384, 387; DRPSAMF ¶¶ 384, 387. In its Order, the Board cited 10 M.R.S. section 8008 and found "it abundantly clear that Dr. Stulc was neither honest in his practice of medicine nor trustworthy."[79] PSAMF ¶¶ 385–86; DRPSAMF ¶¶ 385–86.

Redington-Fairview had no dispute with the Board's revocation of Dr. Stulc's license to practice medicine in Maine. PSAMF ¶ 406; DRPSAMF ¶ 406. The Board's revocation of Dr. Stulc's medical license helped protect patients at the Hospital.[80] PSAMF ¶ 407; DRPSAMF ¶ 407.

---

reflect that Ms. Daigle's testimony reflected her view that there was a hostile work environment there; the Court otherwise overrules the Hospital's objection and deems the paragraph admitted.

[77] Redington-Fairview objects to and denies Plaintiff's material fact paragraph 382 on the ground that Ms. Daigle has not presented a sufficient foundation for the paragraph. DRPSAMF ¶ 382. The Court overrules the Hospital's objection and deems the paragraph admitted. Redington-Fairview objects to and denies Plaintiff's material fact paragraph 383 to the extent it alleges that the ungloved examination was a "sexual assault on Jane Doe." DRPSAMF ¶ 383. The Court strikes that portion of Plaintiff's material fact paragraph 383 on the ground that it is argument, not fact.

[78] Redington-Fairview objects to and denies Plaintiff's material fact paragraph 384 on the ground that Ms. Daigle has not presented a sufficient foundation for the statement. DRPSAMF ¶ 384. The Court overrules the Hospital's objection and deems the paragraph admitted

[79] Redington-Fairview objects to and denies Plaintiff's material fact paragraph 386 on the ground that Ms. Daigle has not presented a sufficient foundation for the statement. DRPSAMF ¶ 386. The Court overrules the Hospital's objection and deems the statement admitted. Redington-Fairview objects to and denies Plaintiff's Statement of Material Facts paragraph 388 in which Ms. Daigle characterizes the Board's views. PSAMF ¶ 388; DRPSAMF ¶ 388. The Court agrees that Ms. Daigle's view of the Board's view is not admissible and the Court strikes Plaintiff's Statement of Material Fact paragraph 388.

[80] Redington-Fairview interposed a qualified response to this material fact, saying that Ms. Buckingham actually testified that she *thinks* the revocation helped protect Redington-Fairview patients. PSAMF ¶ 407; DRPSAMF ¶ 407. The Court overrules the Hospital's qualified response

### q.    Tanya Daigle Warns Redington-Fairview

On or about January 25, 2008, Ms. Daigle's attorney wrote to Deborah Buckingham, informing her, among other things, that (1) Dr. Stulc had confronted Ms. Daigle angrily after she had complained about his sexual improprieties, by saying "I will not be second guessed!," a threat that Ms. Daigle took as a retaliatory threat against her job; (2) Ms. Daigle feared for her job, and accordingly sought counseling for the stress and mental distress caused by the conduct and presence of Dr. Stulc and the prospect of his return; (3) in reviewing the application of Dr. Stulc with the state of Maine Board of Licensure in Medicine, she had filed a complaint against Dr. Stulc's Maine license to practice medicine; (4) her counselor was extremely concerned over her safety should Dr. Stulc return to the employ of the Hospital, given the records disclosed regarding Dr. Stulc's past, along with the fact she had reported him to the Maine Board of Licensure in Medicine.  PSAMF ¶ 366; DRPSAMF ¶ 366.

On January 31, 2008, Ms. Daigle's attorney sent Redington-Fairview's lawyer a letter stating that (1) Ms. Daigle and Ms. Gagnon felt compelled to file with the Maine Human Rights Commission for their job protection as well as for the protection of patients at the Hospital, (2) their disclosure of Dr. Stulc's issues before his employment at the Hospital do not violate the "Confidentiality and Computer Use Statement" Ms. Daigle signed, (3) Ms. Daigle's report and complaint to the

---

and deems the paragraph admitted.  It is a logical inference that the Board's revocation of the license of a physician the Board found was "neither honest in his practice of medicine nor trustworthy" helped protect the patients at Redington-Fairview from a potentially dishonest and untrustworthy physician.

Maine Board of Licensure in Medicine of Dr. Stulc's pre-employment documents were handed to the Attorney General's Office and to the Board of Licensure in Medicine for the protection of the patients and employees of the Hospital, (4) the statutes make it clear that both the Hospital and its employees (such as Ms. Daigle and Ms. Gagnon) were absolutely immune from liability by Ms. Daigle's handing over to the Board of Licensure in Medicine the documents she found, and (5) Ms. Daigle would regard any adverse employment consequence against her or Ms. Gagnon to be pretextual.[81]  PSAMF ¶ 367; DRPSAMF ¶ 367.

Ms. Daigle's attorney followed up the January 31, 2008 letter with a February 14, 2008 letter to Redington-Fairview.[82]  PSAMF ¶ 372; DRPSAMF ¶ 372. In the second letter, Ms. Daigle's attorney provided Ms. Daigle's detailed written version of her inquiry to Mr. Willett in which she said she was only trying to understand what the coverage situation would be while Dr. Stulc was "unavailable." PSAMF ¶ 372; DRPSAMF ¶ 372.  The letter also informed Redington-Fairview of Ms. Daigle's reaction to the February 18, 2008 written warning for "breaching confidentiality."  PSAMF ¶ 373; DRPSAMF ¶ 373.  Ms. Daigle's attorney pointed

[81] Redington-Fairview posits a qualified objection, stating that Ms. Daigle has no personal knowledge as to whether the Hospital received the letter her lawyer wrote to its lawyer.  DRPSAMF ¶ 367.  The Court strikes the qualified objection on that basis and deems the paragraph admitted since notice to an attorney is notice to the client.  At the same time, the Court allows the qualified response to the extent that Redington-Fairview emphasized that its acknowledgment of its receipt of Ms. Daigle's attorney's letter does not reflect its admission of the truth of its contents.

[82] The Court admits confusion about the date of this letter.  Ms. Daigle says the letter was dated February 14, 2008; however, she also says that the letter complained about the February 18, 2008 written warning.  PSAMF ¶¶ 372–73.

Redington-Fairview objects to and denies the first, third and fourth sentences of Plaintiff's material fact paragraph 372.  DRPSAMF ¶ 372.  The Hospital contends the paragraphs are argument, not fact.  Id.  The Court overrules the Hospital's objection to the first sentence; the Court sustains the objection to the phrase "events of hostility" in the third sentence and strikes that phrase as argumentative; and, the Court sustains the objection to the fourth sentence and strikes it as argumentative.

out that Ms. Daigle had told Ms. Buckingham and Mr. Leadbetter that her purpose in bringing this information to the Board of Licensure in Medicine and then to Redington-Fairview was in the Hospital's best interest and allowed the Hospital to make informed decisions about Dr. Stulc based on information the Hospital would not otherwise have known. PSAMF ¶ 373; DRPSAMF ¶ 373. The attorney further informed the Hospital that the information helped it protect its employees and patients.[83] PSAMF ¶ 373; DRPSAMF ¶ 373.

### r. Redington-Fairview Does Not Hire Tanya Daigle As Office Manager

While Ms. Daigle worked in the general surgery office at Redington-Fairview, she performed some tasks typically performed by office managers; however, she was never formally appointed to the position, never received a change of pay for performing some office manager functions, and there is nothing in her personnel file that states she was employed or evaluated as the office manager of the general surgery office. DSMF ¶¶ 141–44, 146; PODSMF ¶¶ 141–44, 146. Ms. Daigle's job title was never changed to office manager and she did no billing while she was employed at Redington-Fairview. DSMF ¶¶ 147–48; PODSMF ¶¶ 147–48.

At the same time, even though not formally employed as office manager, Ms. Daigle was acting office manager in the remote office where she and Ms. Gagnon worked. PSAMF ¶ 413; DRPSAMF ¶ 413. When Dr. Stulc began working at the Hospital, Mr. Leadbetter introduced Ms. Daigle to him as the office manager.

---

[83] Redington-Fairview objects to and denies Plaintiff's material fact paragraph 374 on the ground that it is argument, not fact. DRPSAMF ¶ 374. The Court agrees and strikes Plaintiff's Statement of Material Facts paragraph 374. For the same reason, the Court strikes Plaintiff's Statement of Material Facts paragraphs 375–77.

PSAMF ¶¶ 415, 431; DRPSAMF ¶¶ 415, 431. When Dr. Stulc wrote to and testified before the Board of Licensure in Medicine, he identified Ms. Daigle as the office manager.[84] PSAMF ¶¶ 416–17, 432–33; DRPSAMF ¶¶ 416–17, 432–33. When Mr. Leadbetter introduced Ms. Daigle to Ms. Gagnon, he introduced her as office manager, and at the adjudicatory hearing before the Board, Ms. Gagnon testified that Ms. Daigle was the office manager during the time that Dr. Stulc was at Redington-Fairview.[85] PSAMF ¶¶ 418–19, 434–35; DRPSAMF ¶¶ 418–19, 434–35. As part of her managerial duties, Ms. Daigle attended management meetings at the Hospital, signed off on time cards for Dr. Stulc and Ms. Gagnon, approved requests for time off from office employees, identified herself in emails as office manager, and participated in Ms. Gagnon's five-week employee evaluation. PSAMF ¶¶ 420–424, 436–440; DRPSAMF ¶¶ 420–424; 436–440. Ms. Buckingham admitted that between September 2007 when the Hospital hired Dr. Stulc and April 2008, when it hired May Lisa Rice as office manager, Ms. Daigle performed some of the office managerial duties, such that she was "acting manager" of the office.[86] PSAMF ¶¶ 425, 428; DRPSAMF ¶¶ 425, 428.

---

[84] Redington-Fairview denies Plaintiff's material facts paragraphs 416 and 432 and 417 and 433 (which are virtually identical) on the ground that the paragraphs rely on Ms. Daigle's affidavit for this proposition. PSAMF ¶¶ 416–17, 432–33; DRPSAMF ¶¶ 416–17, 432–33. The Court overrules the Hospital's denials and deems the paragraphs admitted.

[85] Redington-Fairview denied Plaintiff's material facts paragraphs 419 and 435 (which are substantially identical), which say that, when she testified before the Board, Ms. Gagnon identified Ms. Daigle as the office manager during Dr. Stulc's period at the Hospital. PSAMF ¶¶ 419, 425; DRPSAMF ¶¶ 419, 425. The Hospital objects on foundational and hearsay grounds. The Court overrules both objections and deems the paragraphs admitted.

[86] Redington-Fairview qualified Plaintiff's additional material facts paragraph 425 on the ground that Ms. Buckingham testified that Ms. Daigle assumed some, not all of the roles as office manager. PSAMF ¶ 425; DRPSAMF ¶ 425. The Court reviewed the cited testimony and agrees with the Hospital that Ms. Buckingham said that Ms. Daigle "assumed some of those roles." *Buckingham Dep.* 71:24–25; 72:1. She also said that Ms. Daigle was acting office manager of that office. *Id.* 78:10–12. The Court amended the paragraph to reflect Ms. Buckingham's testimony.

When Redington-Fairview expanded the general surgery practice to two physicians, Linda Caron, the Practice Manager, posted an office manager position for the general surgery office. DSMF ¶ 149; PODSMF ¶ 149. Before it posted the position, the Hospital did not inform Ms. Daigle that it was posting the office manager position and Ms. Daigle learned about the positing when a co-employee emailed her about the posting and asked whether she was leaving. PSAMF ¶¶ 426–5, 427, 441; DRPSAMF ¶¶ 426–27, 441. After the posting, Ms. Daigle was told that she could apply for the office manager position and, along with two other candidates, she was interviewed for the position. DSMF ¶¶ 150–52; PODSMF ¶¶ 150–52.

Redington-Fairview did not hire Ms. Daigle for the office manager job; instead, it hired Lisa Rice.[87] DSMF ¶ 155; PODSMF ¶ 155. Ms. Rice had worked as an office manager for another Redington-Fairview physician and had more coding qualifications than Ms. Daigle; Ms. Daigle agrees that Ms. Rice is qualified for the office manager position. DSMF ¶¶ 157–58; PODSMF ¶¶ 157–58. Upon hiring Ms. Rice, Redington-Fairview did not demote Ms. Daigle and did not reduce her pay. DSMF ¶¶ 160–61; PODSMF ¶¶ 160–61.

### s.  Redington-Fairview Terminates Tanya Daigle's Employment[88]

---

[87] Ms. Daigle asserts in her additional material fact paragraph 427 that Redington-Fairview did not hire her in retaliation for her blowing the whistle on Dr. Stulc. PSAMF ¶ 427. Redington-Fairview objected and moved to strike on the ground that this paragraph is argument, not fact. DRPSAMF ¶ 427. The Court agrees and strikes paragraph 427 of the Plaintiff's material facts paragraph 427.

[88] Ms. Daigle's additional material facts paragraphs 442 through 469 are generally problematic. First, many paragraphs attempt to frame her allegations as undisputed facts and thereby generate a genuine issue for summary judgment purposes. For example, paragraph 442 states:

In her performance evaluation dated November 16, 2007, Richard Leadbetter, her supervisor, found that Ms. Daigle had met all her standards. PSAMF ¶ 396; DRPSAMF ¶ 396. Her February 18 through 20, 2008 performance evaluation by Mr. Leadbetter and Ms. Buckingham concluded that two statistics were not met: (1) that Ms. Daigle "ensures patient and hospital confidentiality"; and (2) that Mr. Daigle "maintains confidentiality – assures that guest/hospital confidential information is not discussed outside of job responsibility." PSAMF ¶ 397; DRPSAMF ¶ 397. Both of these statistics were marked as "unmet." PSAMF ¶ 397; DRPSAMF ¶ 397. According to Ms. Buckingham, the only reason Ms. Daigle received "not met" scores was that she had removed information from Dr. Stulc's office that was very highly sensitive and confidential. PSAMF ¶ 398; DRPSAMF ¶

Plaintiff was discharged by [Redington-Fairview] in retaliation for blowing the whistle on Dr. Stulc. No policy was violated by her.

PSAMF ¶ 442. However, these "facts" track the causes of action in Counts VII—Retaliation and VIII—Whistleblower's Protection Act—and amount to legal conclusions, not facts; this lawsuit is about whether Ms. Daigle was fired because she reported violations to the state of Maine Board of Licensure in Medicine and placing her theory of recovery before the Court in affidavit form does not generate a genuine issue of material fact that survives summary judgment. *Compl.* ¶¶ 187–98. Otherwise, all plaintiffs could avoid summary judgment simply by filing a verified complaint or an affidavit reciting the allegations in the complaint.

Second, the phrasing of these "facts" is highly conclusory and argumentative: "This alleged 'reason' for Tanya Daigle's discharge was false and pretextual," PSAMF ¶ 445, "In the Department of Labor Unemployment Insurance Division, [Redington-Fairview] lied in order to deprive Tanya Daigle of her rights, warranting punitive damages," PSAMF ¶ 443, and "[Redington-Fairview]'s retaliation against Tanya Daigle, by engaging in the conduct and acts described above, constituted retaliation by (sic) the Maine Human Rights Act, Title VII and the Maine Workers' Protection Act," PSAMF ¶ 448. As Ms. Daigle knows perfectly well, Redington-Fairview strenuously disputes these allegations; they are not undisputed facts. *Learnard v. Inhabitants of Van Buren*, 182 F. Supp. 2d 115, 119 (D. Me. 2002) ("[M]any of Plaintiff's numbered facts are far from 'short and concise' and contain several distinct facts organized into a brief, argumentative narrative").

Third, whether Ms. Daigle has generated a genuine issue of material fact as to whether Redington-Fairview engaged in a pretextual discharge is the heart of the motion for summary judgment and instead of providing facts, Ms. Daigle has made argument. In fairness to both parties, the Court has tried to pick through the advocacy to see whether the rhetoric cloaks a real factual dispute. In doing so, it has addressed only those material facts that are true facts, not argument. To the extent the Court has not set forth the contents of a paragraph between material facts 442 and 469, it has sustained objections to the argumentative and unproductive nature of these statements.

398.

From February 18, 2008, when she received the written warning, to November 12, 2008, when she was terminated, Ms. Daigle did not receive any warnings or discipline. DSMF ¶¶ 162, 200–01; PODSMF ¶¶ 162, 200–01. During this interval, Ms. Buckingham stated that she received no reports of problems with Ms. Daigle's performance.[89] PSAMF ¶ 411; DRPSAMF ¶ 411. Although Redington-Fairview claims things went pretty smoothly at work during this period and that Ms. Daigle did not feel she was working in a hostile work environment, Ms. Daigle says that she had felt ostracized between November 26, 2007, when Dr. Stulc left work, and April 17, 2008, when he resigned, for blowing the whistle on Dr. Stulc and that during that period, she was nervous that Dr. Stulc might return to Redington-Fairview. DSMF ¶ 163; PODSMF ¶ 163.

On November 9, 2008, Ms. Daigle was handed an Informed Consent form that had been completed and signed by Dr. Shankar and a patient. DSMF ¶ 165; PODSMF ¶ 165. On the form, Dr. Shankar had listed the surgical procedure of colotomy. DSMF ¶ 166; PODSMF ¶ 166. Ms. Daigle thought the procedure might have been a colostomy and she asked Ms. Gagnon, the Medical Assistant, whether Dr. Shankar might have intended the procedure to be a colostomy; Ms. Gagnon replied that she did not know but suggested that Ms. Daigle ask the doctor. DSMF

---

[89] Redington-Fairview interposed a qualified objection to Plaintiff's material fact paragraph 411 on the ground that it did not accurately reflect Ms. Buckingham's testimony. PSAMF ¶ 411; DRPSAMF ¶ 411. The Court has reviewed the testimony Ms. Daigle cited to support this paragraph and the Court agrees that the Hospital's formulation more accurately reflects Ms. Buckingham's actual testimony. *Buckingham Dep.* 53:2–7. The Court has revised the paragraph to reflect the record support.

¶¶ 167, 169; PODSMF ¶¶ 167, 169. Ms. Daigle did not, however, ask the doctor; instead she added an "s" to the word, changing the procedure from a colotomy to a colostomy. DSMF ¶¶ 167, 170; PODSMF ¶¶ 167, 170. In changing the consent form, Ms. Daigle did not intend to injure the patient. PSAMF ¶ 458; DRPSAMF ¶ 458. She also contacted day surgery at Redington-Fairview and booked a colostomy for the patient, and sent to day surgery the original form, identifying the procedure as a colostomy. DSMF ¶ 174; PODSMF ¶ 174.

There is a radical difference between a colotomy and a colostomy: a colotomy is a surgical procedure in which an incision is made in the colon to excise a lesion inside the colon; a colostomy creates an opening in the colon to form an alternative channel for feces to leave the body and often requires the attachment of an appliance or bag. DSMF ¶ 171; PODSMF ¶ 171. Depending on when it was disclosed, the improper booking of a colostomy instead of a colotomy could have triggered administrative and legal problems for the Hospital and a range of potential health and safety issues for the patient.[90] DSMF ¶ 172; PODSMF ¶ 172.

Dr. Shankar discovered that the wrong procedure had been booked and he

_____

[90] In her response to the Defendant's material fact number 172, Ms. Daigle denies the paragraph, referring to eight paragraphs of her affidavit and a number of pages of Ms. Buckingham's affidavit. PODSMF ¶ 172. The Court rejects Ms. Daigle's denial. To support the denial, Ms. Daigle cites paragraphs from her own affidavit, which do not contradict Defendant's material fact paragraph 173. She also cites portions of Ms. Buckingham's deposition, none of which contradicts the Defendant's paragraph. The Hospital's statement—that "the improper booking of a colotomy as a colostomy could have triggered both administrative and legal problems for the Hospital and a range of potential health and safety issues for the patient, depending on when the improper booking was disclosed"—is self-evident and cannot be denied in good faith. If, because of an administrative error, a patient undergoes the wrong surgical procedure, particularly one that—like a colostomy—is invasive and inherently risky, it cannot be denied that the error would pose legal risks to the hospital and medical risks to the patient.

called Ms. Daigle and told her that the procedure should have been a colotomy.[91] DSMF ¶ 175; PODSMF ¶ 175; PSAMF ¶ 444; DRPSAMF ¶ 444. At this point, because Ms. Daigle had already sent the original form to day surgery, she only had a copy of the form. DSMF ¶ 178; PODSMF ¶ 178. She crossed out the "s" on the photocopy of the consent form, writing "error" on the consent form and left the photocopy on the top of her materials so that her mistake would be rectified. DSMF ¶¶ 175, 178–79; PODSMF ¶¶ 175, 178–79; PSAMF ¶ 444; DRPSAMF ¶ 444. Ms. Daigle also called day surgery and told them that the procedure should have been a colotomy; however, she did not mention that she had changed the consent form. DSMF ¶ 176; PODSMF ¶ 176. Ms. Daigle did not tell Dr. Shankar that she had changed the form; however, the fact she had done so was obvious.[92] DSMF ¶ 177; PODSMF ¶ 177. Ms. Daigle asked Ms. Gagnon if she would call the patient and have her come into the office and sign a new consent form. DSMF ¶ 183; PODSMF ¶ 183.

Ms. Daigle was aware that an audit was being conducted of the files in the general surgery office on Monday, November 11, 2008. DSMF ¶ 182; PODSMF ¶

---

[91] It appears that Dr. Shankar first discovered the error and notified Ms. Daigle, who then changed the form. PSAMF ¶ 444; DRPSAMF ¶ 444.

[92] Defendant's material fact number 177 reads: "Ms. Daigle did not tell Dr. Shankar she changed the consent form." DSMF ¶ 177. Ms. Daigle denies the statement, stating in part that "Ms. Daigle did not tell Dr. Shankar she changed the consent form because it was obvious in their discussion that she had changed the consent form; Dr. Shankar knew that she had changed the consent form, and that Ms. Daigle would responsibly correct the consent form, and that she would make sure that the operating room at the hospital would receive a corrected form. Dr. Shankar understood when he spoke to her that the mistake would be rectified by Ms. Daigle and that there was three weeks before surgery." PODSMF ¶ 177. The Court strikes Ms. Daigle's denial and deems the paragraph admitted. The Defendant's paragraph only asserts that Ms. Daigle did not tell Dr. Shankar that she changed the form. After denying the paragraph, Ms. Daigle explains why she did not tell Dr. Shankar she changed the form. The denial is not in good faith and is contradicted by her own response.

182. An auditor from Medical Mutual, Redington-Fairview's insurance carrier, discovered the consent form with the word "error" on it and brought this to the attention of Ms. Rice, the general surgery office manager. DSMF ¶ 184; PODSMF ¶ 184. Ms. Rice informed Ms. Buckingham that Ms. Daigle had altered a consent form that had been signed by a patient and a physician and had changed the procedure the physician had written on the form from colotomy to colostomy. DSMF ¶ 185; PODSMF ¶ 185. Ms. Buckingham was also informed that Ms. Gagnon had told Ms. Daigle to discuss the form with the surgeon before changing it and that Ms. Daigle had asked Ms. Gagnon to contact the patient to come to the hospital to sign a new consent form. DSMF ¶ 187; PODSMF ¶ 187. When Ms. Rice questioned Ms. Daigle about the consent form, Ms. Daigle attempted to place blame for what she had done on Ms. Gagnon.[93] DSMF ¶ 188; PODSMF ¶ 188. Ms. Buckingham also contacted Virginia Farley, Manager of the Post Anesthesia Care Unit (PACU) and Day Surgery at Redington-Fairview, to obtain the consent form on file at the Hospital and Ms. Farley confirmed that the consent form at the Hospital described the procedure as a "colostomy," not a "colotomy," and that the consent form at the Hospital differed from the consent form Ms. Rice had from general surgery. DSMF ¶ 189; PODSMF ¶ 189.

Ms. Buckingham brought the matter to the attention of Mr. Willett and they agreed that Redington-Fairview should terminate Ms. Daigle's employment. DSMF

---

[93] Ms. Daigle denies this assertion. PODSMF ¶ 188. However, in the denial she references her deposition testimony page 146, line 6 through page 163, line 8. *Id.* (citing *Daigle Dep.* 146:6–163:8). The Court has no obligation to wade through pages of a deposition to determine whether the denial is supported by the record and treats the assertion as admitted.

¶¶ 191–92; PODSMF ¶¶ 191–92. Ms. Buckingham discussed the termination with counsel because Ms. Daigle had a sexual harassment claim against the Hospital pending before the Maine Human Rights Commission and Ms. Buckingham was concerned that Ms. Daigle would claim that the Hospital's termination decision was retaliatory.[94] DSMF ¶ 195; PODSMF ¶ 195. Ms. Buckingham did not ask Tanya Daigle her side of the story until after she had prepared the termination documents.[95] PSAMF ¶ 457; DRPSAMF ¶ 457. Ms. Buckingham, who first recommended that Ms. Daigle be terminated for the error, did not look to find out whether her conduct violated any Redington-Fairview policy. PSAMF ¶ 462; DRPSAMF ¶ 462.

Mr. Willett did not discuss the termination decision with anyone, including Dr. Shankar, other than Ms. Buckingham and possibly Mr. Kempton before discharging Ms. Daigle.[96] DSMF ¶¶ 196–97; PODSMF ¶¶ 196–97. Specifically, Mr. Willett did not speak with Ms. Daigle before approving the discharge recommended by Ms. Buckingham. PSAMF ¶ 466; DRPSAMF ¶ 466. Ms. Buckingham did not inform Mr. Willett that Ms. Daigle had violated any particular written Redington-

---

[94] Ms. Daigle admitted the truth of this paragraph but states that it is "inadmissible." PODSMF ¶ 195. The Court disagrees and deems the paragraph admitted.

[95] Redington-Fairview qualifies its response to Plaintiff's material fact paragraph 457 but its response explains and does not deny the assertion. DRPSAMF ¶ 457.

[96] In her material fact paragraph 452, Ms. Daigle asserts that the only two persons involved in the termination decision were Lisa Rice and Richard Willett. PSAMF ¶ 452. The record citation for this assertion is a portion of Mr. Willett's testimony. *Willett Dep.* 23:24–25:6. During this testimony, Mr. Willett does not mention Ms. Rice. This assertion contradicts the assertion in paragraph 456 that the only persons who determined that the mistake warranted termination were Mr. Willett and Ms. Buckingham. PSAMF ¶ 456. Furthermore, Ms. Daigle admitted Redington-Fairview's assertion that Mr. Willett did not discuss the termination decision with anyone other than Ms. Buckingham, and possibly Mr. Kempton, before Ms. Daigle was discharged. DSMF ¶ 196; PODSMF ¶ 196. The Court concludes that Ms. Daigle's assertion that Ms. Rice was involved in the decision to terminate her is not supported by the record.

Fairview policy. PSAMF ¶ 469; DRPSAMF ¶ 469. Mr. Willett's involvement was limited to hearing what Ms. Buckingham said happened and concurring with her recommendation; this part of the process was "pretty brief."[97] PSAMF ¶ 467; DRPSAMF ¶ 467.

Neither Ms. Buckingham nor Dr. Shankar was aware of any other situation in which an employee had done something similar to what Ms. Daigle had done— i.e. changed a procedure a physician had documented in a consent form, and Ms. Buckingham was not aware of any other incident involving the inappropriate completion or handling of a consent form by a Redington-Fairview employee. DSMF ¶¶ 198–99; PODSMF ¶ 199.[98] Other than Ms. Daigle, Redington-Fairview has never disciplined an employee for changing a consent form. PSAMF ¶ 460; DRPSAMF ¶ 460.

On November 12, 2008, Ms. Rice and Ms. Buckingham met with Ms. Daigle. DSMF ¶ 200; PODSMF ¶ 200. Ms. Buckingham showed Ms. Daigle the two consent forms and asked her if she had changed them.[99] Ms. Daigle admitted she had altered the forms, and had made a mistake. DSMF ¶ 200; PODSMF ¶ 200; PSAMF ¶ 444; DRPSAMF ¶ 444. Ms. Daigle was informed that her employment was

---

[97] Ms. Daigle's material fact asserts that Mr. Willett said it was probably five minutes. PSAMF ¶ 467. Redington-Fairview qualified its response on the ground that Mr. Willett only said it was "brief." The Court reviewed the cited testimony and agrees with the Hospital that Mr. Willett did not admit that his involvement lasted only five minutes but did say that it was "brief" and "pretty brief." *Willett Dep.* 55:20–56:1. The Court altered the assertion to reflect the record support.

[98] Ms. Daigle did not respond to Defendant's material fact paragraph 198; the paragraph is deemed admitted.

[99] Ms. Daigle posits a qualified response to this paragraph, noting there was "only one form and one mistake." PODSMF ¶ 200. Based on her prior admissions, however, it is clear that there were two forms, an original form that went to day surgery and a photocopy that remained in general surgery. DSMF ¶¶ 175–79; PODSMF ¶¶ 175–79. Ms. Daigle changed the photocopy of the form, which had remained in general surgery. *Id.*

terminated effective that day.[100]  DSMF ¶ 201; PODSMF ¶ 201.  On the "Warning Report" in which Ms. Buckingham implemented the decision to immediately terminate Ms. Daigle on November 12, 2008, Ms. Buckingham noted that Ms. Daigle had previously been warned.  PSAMF ¶ 464; DRPSAMF ¶ 464.

### t.    Tanya Daigle's Punitive Damages Claim

In addition to the facts underlying her primary claims, Ms. Daigle is seeking punitive damages against Redington-Fairview and, in response to Redington-Fairview's motion for summary judgment, she posited facts that she contends generate triable issues.[101]  Ms. Daigle generally asserts that Redington-Fairview

---

[100] In her additional material fact paragraph 305, Ms. Daigle asserts that she was demoted and discharged in retaliation for blowing the whistle on Dr. Stulc and makes similar argumentative assertions.  PSAMF ¶ 305.  The Court strikes all but the last sentence of Plaintiff's Statement of Material Facts paragraph 305 because the facts are buried in argument.

[101] As previously, in this section, Ms. Daigle's material facts are highly argumentative and problematic.  The Court has done its best to ignore the rhetoric and set forth the facts that Ms. Daigle contends defeat the Hospital's motion.  To the extent the Court has not set forth Ms. Daigle version of the "facts," it is because those facts are not facts at all, but argument.  *Learnard*, 182 F. Supp. 2d at 119.  Regarding material fact paragraphs 470, 471, 475, PSAMF ¶¶ 470–471, 475, 478; DRPSAMF ¶¶ 470–71, 475, 478, 489, the Court earlier rejected Ms. Daigle's assertions that Dr. Stulc applied for a license to practice medicine in the commonwealth of Massachusetts and that the Hospital failed to comply with the Health Care Quality Improvement Act and its regulations.  *Supra* fn. 34.  Regarding material fact paragraph 473, Ms. Daigle failed to include a record citation and therefore the Court strikes it.  PSAMF ¶ 473; DRPSAMF ¶ 473.  Plaintiff's material fact paragraph 474 is both argumentative and a legal conclusion and the Court strikes it.  PSAMF ¶ 474; DRPSAMF ¶ 474.  Plaintiff's material fact paragraph 477 cites Exhibit 12, PSAMF ¶ 477; Redington-Fairview objected on the ground there is no Exhibit 12 in the summary judgment record.  DRPSAMF ¶ 477.  The only Exhibit 12 the Court could locate is Exhibit 12 to Ms. Daigle's deposition, which was attached to the Hospital's material facts.  DSMF Attach. 12, Ex. 12.  But Exhibit 12 to Ms. Daigle's deposition does not support the assertion in paragraph 477 of her material facts.  The Court strikes paragraph 477 as unsupported by the record citation.  In material facts paragraphs 478 and 479, Ms. Daigle says that the Hospital never reported Dr. Stulc to the Board of Licensure in Medicine and to the National Practitioners Data Bank.  PSAMF ¶¶ 478–79.  The Hospital objects on the ground that the cited evidence does not support the assertion and it proffers its view that it did file the reports with both the Board and the Data Bank.  DRPSAMF ¶ 478-–79.  The Court agrees with the Hospital that the record citation does not support the assertion.  Ms. Daigle cited the testimony of Mr. Willett and during the cited portion of his deposition, Mr. Willett was being asked about whether the Hospital informed the Board or the Data Bank about the PERTS reports.  *Willett Dep.* 38:12–39:2.  Ms. Daigle's more general assertion that the Hospital never expressly reported Dr. Stulc's alleged misbehavior at Redington-Fairview to the Board or the Data Bank may be true, but it is not supported by this record citation.  In her material fact paragraph 481 and 483, Ms. Daigle asserts

has had a history of discriminating against females in a number of respects as evidenced by a number of incidents. PSAMF ¶ 472; DRPSAMF ¶ 472. In 2007, a male physician, Dr. Raxi Saydjari, a general surgeon, complained to the Board of Trustees of Redington-Fairview that the Hospital was treating female physicians less favorably than male physicians.[102] PSAMF ¶ 476; DRPSAMF ¶ 476. The Hospital never gave the Board of Licensure in Medicine the PERTS report. PSAMF ¶ 480; DRPSAMF ¶ 480. In Mr. Willett's May 6, 2008 letter to the Board of Licensure in Medicine, he informed the Board that Dr. Stulc had resigned but did not inform the Board that the Hospital had concluded that he had clearly lied when he denied the allegations that he had viewed pornography. PSAMF ¶ 482; DRPSAMF ¶ 482. In addition, Mr. Willett's May 6, 2008 letter did not mention the

---

that despite the fact that the Hospital wrote to the Board about Dr. Stulc, it "mentioned nothing regarding his sexual perverse and predatory misconduct." PSAMF ¶ 481, 483. In support, she cites Exhibit 2 of Mr. Kempton's deposition, which is his May 6, 2008 letter to the Board concerning Dr. Stulc. *Sealed Document* Ex. 2. The document is under seal; however, the Court has reviewed it and concludes that the letter does not support Ms. Daigle's assertions. In her material fact paragraph 484, Ms. Daigle says that the Hospital did not inform the Board that Dr. Stulc's privileges had been suspended. PSAMF ¶ 484. The Hospital objects on the ground that there is no evidence the Hospital had suspended Dr. Stulc's medical staff privileges during that interval. DRPSAMF ¶ 484. The Court agrees with the Hospital. The Hospital had suspended Dr. Stulc's pay but not his medical staff privileges and therefore it is immaterial that it did not inform the Board of something it had not done. The Court sustains the Hospital's objection to material fact paragraph 485 because it is argumentative. PSAMF ¶ 485; DRPSAMF ¶ 485. In her material fact paragraph 488, Ms. Daigle says that the August 4, 2009 letter from Donna Bickford of Redington-Fairview to the Board of Licensure in Medicine regarding the reason Dr. Stulc resigned his privileges was "untrue" because it mentioned only his failure to be forthright in his application for Medical Staff membership and privileges and did not mention the allegations of his misconduct at Redington-Fairview. PSAMF ¶ 488. The Hospital objects on the ground that it is argument, not fact. DRPSAMF ¶ 488. The Court disagrees with the Hospital regarding the contents of the letter itself, but it agrees with the Hospital about the assertion that the statement was untrue.

[102] Plaintiff's material fact paragraph 476 says that Dr. Saydjari reported to the Board at Redington-Fairview that women physicians were treated less favorably than men physicians, including with respect to employment agreements. PSAMF ¶ 476. The Hospital denied the assertion on the ground that Dr. Saydjari's cited testimony said only that he complained to the Board that female doctors were treated less favorably than male doctors. DSPRSAMF ¶ 476. The Court reviewed the cited testimony and agrees with the Hospital that the cited testimony does not mention employment agreements. *Willett Dep.* 72:21–73:20. The Court reframed Ms. Daigle's paragraph to accurately reflect the record.

allegation that Dr. Stulc had violated a young female patient in the OR.  PSAMF ¶ 486; DRPSAMF ¶ 486.  The Hospital withheld information on August 4, 2009 when it confirmed that Dr. Stulc had resigned his privileges at Redington-Fairview effective April 17, 2008.  PSAMF ¶ 487; DRPSAMF ¶ 487.  It reported that Dr. Stulc had resigned his Redington-Fairview privileges while under investigation for his failure to be forthright on the application for Medical Staff membership and privileges at the Hospital.  PSAMF ¶ 488; DRPSAMF ¶ 488.

## II.    THE PARTIES' POSITIONS

### A.    The Motion: An Overview

Of the eight counts in her Amended Complaint, Tanya Daigle posited five counts against Redington-Fairview.  *Am. Comp.*  Redington-Fairview moves for judgment on each: 1) Count IV—Hostile Work Environment—Maine Human Rights Act and Title VII; 2) Count V—Retaliation—Maine Human Rights Act and Title VII; 3) Count VI—Whistleblower's Protection Act; 4) Count VII—Discrimination Based on Gender—Title VII; and, 5) Count VIII—Discrimination Based on Gender—Maine Human Rights Act.  *Def.'s Mot.* at 2.

### B.    Redington-Fairview's Position

Redington-Fairview says that even though Ms. Daigle divided her claims into different counts, her legal claims can be divided into two basic theories: hostile environment sexual harassment under Title VII and the Maine Human Rights Act (MHRA); and retaliation under Title VII, the MHRA, and the Maine Whistleblower's Protection Act.  *Id.*  The Hospital asserts that it is not responsible

for the hostile environment sexual harassment set of claims because 1) Dr. Stulc was not a supervisory employee, 2) the Hospital took prompt remedial action, and 3) the facts are not sufficiently severe or pervasive to constitute actionable sexual harassment. *Id.* at 3–12; *Def.'s Reply* at 1–5. The Hospital then claims it is not responsible for retaliation because 1) Ms. Daigle failed to first bring the alleged violation to her employer, 2) Ms. Daigle did not sustain an adverse employment action, and 3) she failed to demonstrate a causal nexus between her complaints and her discharge. *Def.'s Mot.* at 12–25. Finally, Redington-Fairview contends it is entitled to judgment on the punitive damages claim. *Id.* at 25–26.

### C.    Tanya Daigle's Response

Ms. Daigle disputes the Hospital's positions that Dr. Stulc did not have *de facto* authority over her employment and that the Hospital's response was sufficiently remedial or effective. *Pl.'s Resp.* at 3–7. She asserts that she was subjected to severe and pervasive sexual harassment and hostility. *Id.* at 8–15. Turning to the retaliation theory, Ms. Daigle claims she was engaged in protected activity, that her warning, demotion, and termination constituted adverse employment actions, and that she has demonstrated a causal link between her whistleblowing and the adverse employment actions. *Id.* at 15–19. Finally, she contends she has presented sufficient evidence to generate a punitive damage claim against the Hospital. *Id.* at 19.

### III.    DISCUSSION

## A.     The Summary Judgment Standard[103]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995); *accord Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006); *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218–19 (1st Cir. 2004).  An issue is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *McCarthy*, 56 F.3d at 315 (quoting *United States v. One Parcel of Real Prop. with Bldgs., Appurtenances, and Improvements, Known As Plat 20, Lot 17, Great Harbor Neck, New Shoreham, Rhode Island*, 960 F.2d 200, 204 (1st Cir. 1992)); *accord Seaboard Sur. Co.*, 370 F.3d at 218–19.  Once this evidence is supplied by the moving party, the nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." *Tropigas de Puerto Rico, Inc.*, 637 F.3d at 56; *accord ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002).

The Court "afford[s] no evidentiary weight to 'conclusory allegations, empty

---

[103] On December 1, 2010, while this motion was pending, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective.  *See Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 n.4 (1st Cir. 2011).  Applying the amended version of Rule 56 to this case is "just and practicable" and would not "work a manifest injustice" because the amendments "do not change the summary judgment standard or burdens."  *Id.  See also Tropigas de Puerto Rico, Inc. v. Certain Underwriters At Lloyds Of London*, 637 F.3d 53, 56 n.5 (1st Cir. 2011) (stating that "[t]he substantive standard for summary judgment remains unchanged"); *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 n.4 (1st Cir. 2011) (same); *Del Toro Pacheco v. Pereira*, 633 F.3d 57, 62 n.6 (1st Cir. 2011) (same); *Hartford Fire Ins. Co. v. CNA Ins. Co. (Eur.)*, 633 F.3d 50, 54 n.6 (1st Cir. 2011) (same).

rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas de Puerto Rico, Inc.*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236–37 (1st Cir. 2002). Rather, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll*, 294 F.3d at 237 (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35; *accord Merchs. Ins. Co. of N.H., Inc. v. United States Fid. & Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998).

## B.     Hostile Work Environment

### 1.     Legal Standards

One way of violating Title VII is "requiring people to work in a discriminatorily hostile or abusive environment." *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). As a general proposition, a plaintiff may recover on a hostile work environment theory when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6–7 (1st Cir. 2011) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *O'Rourke v. City of Providence*, 235 F.3d

713, 728 (1st Cir. 2001) (same). "[T]he hostile work environment test requires an assessment of the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Valentin-Almeyda*, 447 F.3d at 94 (quoting *Harris*, 510 U.S. at 23). The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 7 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). In addition, the plaintiff must show "that the employer is liable either for creating or for tolerating that atmosphere." *Id.* Furthermore, "whether the misconduct actually occurred and whether it created an actionably hostile work environment are questions for the trier of fact, not for the court." *Id.*

## 2. Dr. Stulc: Supervisor or Co-Employee

"A plaintiff must satisfy different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee of the victim." *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002). An employer is "vicariously liable if [its] supervisor . . . created a hostile work environment." *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 (1st Cir. 2007). "When co-workers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment . . . an employer can only be liable if the harassment is causally connected to some negligence on the

employer's part." *Wilson,* 639 F.3d at 7 (quoting *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005)). In other words, the plaintiff must demonstrate that "the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." *Id.* (citing *Crowley*, 303 F.3d at 401). However, "notice alone is not enough. Liability only attaches if the employer, after receiving notice, fails to take prompt and appropriate ameliorative action." *Id.* at 8. Summary judgment will lie "when the undisputed facts show that a reasonable jury could not help but conclude that the employer's response was both timely and appropriate." *Id.* Although the law requires the employer to respond, it does not require the employer to respond in any particular way and the law recognizes that "the imposition of employee discipline is not a rote exercise, and an employer must be accorded some flexibility in selecting condign sanctions for particular instances of employee misconduct." *Id.*

"[T]he determination of whether an employee is a *de facto* supervisor . . . is "factual in nature." *Id.* at 17. Nonetheless, "a minimum factual predicate must be present to avoid summary judgment on such an issue." *Id.* at 9. "[S]tanding alone, a [plaintiff's] subjective belief is insufficient to create a triable issue of material fact about a coworker's status." *Id.* at 10. A supervisor is one who has "the authority to affect the terms and conditions of . . . employment." *Id.* at 9 (quoting *Noviello*, 398 F.3d at 96). This authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Id.* (quoting *Noviello*, 398 F.3d at 96). Depending on the context, a supervisor's responsibilities must "include the duty to

forward harassment complaints up the line (that is, to upper management)." *Id.*

With these principles in mind, there is scant evidence in this record that Dr. Stulc was Ms. Daigle's supervisor. There is no evidence that he was involved in hiring her, setting her hourly wage, determining her work schedule, disciplining her, promoting her (or not), or that he had the authority to fire her. There is no evidence that Dr. Stulc was a person to whom Ms. Daigle was required to make a complaint of sexual harassment and there is substantial evidence that she complained about his actions through a chain of command that did not include him. In short, the Court concludes that there is no evidence that Dr. Stulc had the authority to affect the terms and conditions of Ms. Daigle's employment.

This is not to say that the economic and power relationship between a general surgeon and a medical secretary is equal. It is decidedly not. There may be a case where a low-level hospital employee could prove that a physician, particularly an employed physician, had such influence over the hospital administration that he effectively had supervisory authority over her. But this is not that case. The only evidence that buttresses Ms. Daigle's argument is Mr. Leadbetter's comment in mid-October 2007 that "Dr. Stulc is not going anywhere and if [you cannot] work with the doctor," he would "find another position" for her. PSAMF ¶ 244; DRPSAMF ¶ 244. This comment does not establish that Dr. Stulc was Ms. Daigle's supervisor. Instead, it emphasizes that the individual with decision-making authority was Mr. Leadbetter, not Dr. Stulc, since Mr. Leadbetter said he would reassign Ms. Daigle.

On this record, the Court concludes that Ms. Daigle failed to present "a minimum factual predicate . . . to avoid summary judgment on [this] issue." *Wilson*, 639 F.3d at 9. Ms. Daigle also points to the positive five-week review that Dr. Stulc received, but she does not explain why the Hospital's positive review of the doctor makes him her supervisor. There is no genuine issue of material fact as to whether Dr. Stulc was Ms. Daigle's supervisor: he was not.

### 3. The Work Environment at Redington-Fairview

As Dr. Stulc was a co-employee, Ms. Daigle's hostile environment sexual harassment claim must demonstrate that "the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." *Id.* at 7. There is the overwhelming evidence in this record that when Ms. Daigle complained about Dr. Stulc, the Hospital took her complaints seriously and took prompt action. Following her complaints about Dr. Stulc, the Hospital warned him about his conduct and put him on a leave of absence, and ultimately terminated him.

From September 1, 2007 to September 19, 2007, Dr. Stulc worked at Redington-Fairview as a locum tenens and on September 19, 2007, the Hospital hired him as a general surgeon. Ms. Daigle's problems with Dr. Stulc began either during the last week of September or the first week of October and the Hospital placed him on administrative leave on November 26, 2007. Ms. Daigle's first problem occurred when Dr. Stulc yelled at her and told her not to second guess him. Ms. Daigle reported his conduct to Mr. Leadbetter and Dr. Renfrew and, in

response, Dr. Renfrew asked her to set up a meeting among Dr. Stulc, Virginia Farley, himself and herself to work out expectations.[104]

Ms. Daigle's second problem with Dr. Stulc occurred on October 10, 2007 when she discovered the pornographic printouts. When Mr. Kempton came to investigate, Ms. Daigle and Ms. Gagnon told him about Dr. Stulc's inappropriate conduct around female patients and Ms. Gagnon mentioned his inappropriate comments to a male patient. Shortly thereafter, the administration met with Dr. Stulc and told him that the Hospital would not tolerate this type of behavior. After Dr. Stulc appeared remorseful, Mr. Leadbetter met with Ms. Daigle (and Ms. Gagnon) and assured them that the Hospital would not retaliate against them for making the complaint, instructed them to report anything they witnessed that was unethical, and confirmed that Dr. Stulc admitted looking at pornography. Ms. Daigle said that she felt she could continue to work with Dr. Stulc if he was remorseful and promised not to engage in this behavior.

In addition to meeting with Dr. Stulc, the Hospital arranged for a meeting among Mr. Kempton, Mr. Leadbetter, Dr. Stulc, Ms. Daigle, and Ms. Gagnon. The meeting took place on October 12, 2007. Although Ms. Daigle has criticized the meeting as being without a mediator, without the presence of a female administrator, and not addressing all her issues the way she preferred, the law gives an employer a range of discretion as to how to respond to harassment

---

[104] Although Ms. Daigle said that about one month later—either late October or early November—Dr. Stulc became upset when she could not read a word he had written on a form and he told her she should go back to school, there is no indication that she complained to the administration about this comment.

complaints and it is not necessary that in doing so, the employer must satisfy the complainant's view of how it should proceed.[105]  *See id.* at 8–9 (discussing the need to accord the employer some flexibility in selecting the correct sanction).

Next is Dr. Stulc's physical examination of a female patient in the OR on November 21, 2007.  The Court assumes that even though the incident did not directly involve Ms. Daigle, the doctor's actions could have contributed to an overall atmosphere of sexual harassment.  Here, the nurses in the OR informed the Hospital administration and the Hospital generated a PERTS Report.  The Hospital did not treat the incident as one of sexual misconduct; instead, it treated the incident as a violation of standard precautions and infection control practices.  Dr. Renfrew told Dr. Stulc that he was never to do this again.  Here, the record reflects that the Hospital acted promptly, that Dr. Stulc's actions were the subject of an internal investigation and report, and that the Medical Director verbally reprimanded Dr. Stulc.  This is sufficient under the law.  *See id.* at 8 (dismissing a plaintiff's argument that "a verbal reprimand and warning constituted too mild a sanction" and that harassing coworkers' speech "should have resulted in their immediate discharge").  Again, Ms. Gagnon assumed a different view of the

---

[105] Although Ms. Daigle has developed a list of instances of Dr. Stulc's asserted misconduct from October 15, 2007 to November 19, 2007, there is no evidence that Ms. Daigle (or anyone else) informed anyone in administration about his misbehavior during this interval.  Thus, there is no evidence that "the employer knew or should have known about the harassment." *Id.* at 11.

On November 20, 2007, Ms. Daigle emailed Mr. Leadbetter describing several operational issues of concern about Dr. Stulc, including that he did not always answer his pages, that he was forcing patients to wait, and that he was not a team player.  However, none of these operational concerns touches on sexual harassment.  Furthermore, Mr. Leadbetter had scheduled another meeting to discuss these concerns for Tuesday, November 27, 2007 but the meeting never took place because the Hospital placed Dr. Stulc on administrative leave by then.

incident, seeing it as part of Dr. Stulc's pattern of sexual misconduct, and she says that as sexual misconduct, the OR complaint should have triggered a report to the National Data Bank, to the Board of Licensure in Medicine, and to Ms. Buckingham, the Director of Human Resources. However, as the Court has noted, the employer is not required to accept the complainant's view of the nature of a co-employee's actions or the proper remedy. In any event, within a week, the Hospital had placed Dr. Stulc on administrative leave.

The fourth incident also occurred on November 21, 2007, when Ms. Daigle discovered additional pornography on Dr. Stulc's office computer. She complained to Mr. Leadbetter and he immediately came to the office, viewed the images, and met with Ms. Daigle and other employees. After confirming the existence of inappropriate images on his computer, the Hospital placed Dr. Stulc on administrative leave and prohibited him from working there effective Monday, November 26, 2007, the very next working day. Although Ms. Daigle objects to the Hospital's attempts between November 26, 2007 and April 17, 2008 to require him to undergo counseling, her complaint runs to an area of employer discretion. Here, the Hospital suspended Dr. Stulc and as the First Circuit noted in *Wilson*, Title VII "does not invariably require termination or suspension as a response to harassment (even serious harassment)." *Id.* at 8.

Ms. Daigle's concern during the period from November 26, 2007 to April 17, 2008, that Dr. Stulc might return and that she was told to tell patients only that Dr. Stulc was "unavailable" is essentially a disagreement with her employer about its

selected sanction; it amounts to a contention that the Hospital had to terminate Dr. Stulc, not suspend him, and could not legally seek less draconian sanctions, such as mentoring and counseling. If the Hospital had allowed Ms. Daigle to do what she wanted to do—inform the general public that a general surgeon had been suspended for sexual impropriety—it would have been exceedingly difficult to bring Dr. Stulc back to work at Redington-Fairview. However, the First Circuit recently commented that "there is no legal rule that requires treating [a violation of Title VII] as the workplace equivalent of a capital offense." *Id.*

Ms. Daigle contends that the Hospital's later handling of Dr. Stulc's resignation perpetuated an atmosphere of sexual harassment. She complains that the Hospital should have reported Dr. Stulc's sexual misconduct to the Maine Board of Licensure in Medicine and to the National Data Bank, and that it should not have relied on the misrepresentations in his Medical Staff application to institute the investigation that led to his resignation. However, as with the other complaints, Ms. Daigle's disagreement with the Hospital on this point is a disagreement with her employer's choice of remedy.

Finally, although Ms. Daigle attempts to weave into her sexual harassment claim the Hospital's disciplinary process that led to the written warning on February 18, 2008, the causal link between the Hospital's action and the maintenance of an abusive work environment is extremely attenuated. By the time the Hospital disciplined Ms. Daigle, Dr. Stulc had not worked there for 2 ½ months, was the subject of Ms. Daigle's pending complaint before the Board of Licensure in

Medicine, and Ms. Daigle herself had discovered evidence that led to Dr. Stulc's resignation from the Redington-Fairview Medical Staff and to the Board's revocation of his license to practice medicine in Maine. Ms. Daigle has never asserted that anyone at the Hospital other than Dr. Stulc engaged in sexually inappropriate behavior and the connection between the Hospital's February 2008 written warning and an allegedly abusive working environment from a physician who had been long suspended, never to return to work, is a step too far.

If Ms. Daigle's chronology of events states a cause of action, it must be as a retaliation claim, and the Court turns next to that issue.

### C.      Retaliation

#### 1.      Legal Standards

To make out a claim for retaliation, a plaintiff must point to specific facts that show: (1) she engaged in protected conduct protected by statute; (2) she was subjected to an adverse employment action after the protected conduct occurred; and (3) there was a causal link between the protected conduct and the adverse employment action. *Collazo v. Bristol-Myers Squibb Mfg.*, 617 F.3d 39, 46 (1st Cir. 2010); *Valentin-Almeyda*, 447 F.3d at 94. The same criteria apply to a MWPA claim. *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053. "Protected conduct includes not only the filing of administrative complaints but also complaining to one's superiors." *Valentin-Almeyda*, 447 F.3d at 94 (internal citation omitted). "[T]o be adverse, an employment action 'must materially change the conditions' of the plaintiff's employment; examples include

'disadvantageous transfers or assignments' and 'unwarranted negative job evaluations.'" *Id.* at 95 (quoting *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002)).

Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff has made a prima facie showing of retaliation, the defendant must articulate a legitimate, non-retaliatory reason for its employment decision, and if the defendant meets this burden, the plaintiff must show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus. *Collazo*, 617 F.3d at 46 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-03 (1973)). The defendant's burden is one of production only; the burden of persuasion remains on the plaintiff. *Valentin-Almeyda*, 447 F.3d at 95. The Title VII analytic framework applies to retaliation claims under the MWPA.[106]

## 2. The Prima Facie Case

Ms. Daigle has the initial undemanding task of making a prima facie case of unlawful retaliation. *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 51 (1st Cir. 2010); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991) ("The burden of making out a prima facie case is 'not onerous'" (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 253, 253 (1981))). Furthermore, under First Circuit authority, the Court may not "consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case."

---

[106] More precisely, the claim must be that Redington-Fairview violated the Maine Human Rights Act, 5 M.R.S. § 4572(1)(A) by subjecting Ms. Daigle to an adverse employment action for exercising her rights under the MWPA. *Tripp v. Cole*, 425 F.3d 5, 9 n.4 (1st Cir. 2005); *Roussel v. St. Joseph Hosp.*, 257 F. Supp. 2d 280, 285 (D. Me. 2003).

*Melendez*, 622 F.3d at 51 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003)).

### a. Protected Activity

Redington-Fairview first contends that Ms. Daigle's retaliation claim must fail because she limited her retaliation claim to state law and she failed to bring the alleged violation to a person at the Hospital with supervisory authority as required by the Maine Whistleblowers Protection Act (MWPA), 26 M.R.S. § 833(2). *Def.'s Mot.* at 13–14, 14 n.9. The Hospital then says that to be actionable, a retaliation claim must be based on the plaintiff's opposition to an employment practice made unlawful by either the MWPA or Title VII, and as Ms. Daigle did not complain to the Board of Licensure in Medicine about an employment practice at Redington-Fairview, neither statute applies. *Id.* at 14. Ms. Daigle implicitly responds that she is maintaining a Title VII retaliation claim as well as a MWPA claim. *Pl.'s Resp.* at 15–16. She also claims that her report of Dr. Stulc to the Board constituted protected conduct. *Id.* at 16.

The Court agrees with Ms. Daigle. First, the Court does not conclude that Ms. Daigle waived her right to proceed under both federal and state law. As regards the state law claim, the MWPA provides that actions protected from discrimination include an employee:

> acting in good faith . . . report[ing] orally or in writing to . . . a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

> [or]

acting in good faith and consistent with state and federal privacy laws, report[ing] . . . to the appropriate licensing, regulating or credentialing authority, orally or in writing, what the employee has reasonable cause to believe is an act or omission that constitutes a deviation from the applicable standard of care for a patient by an employer charged with the care of that patient.

26 M.R.S. § 833(1)(A), (E).

Redington-Fairview argues that Ms. Daigle cannot seek shelter under the MWPA "[b]ecause the [Board of Licensing in Medicine] Complaint did not concern an unlawful *employment practice* of Ms. Daigle's employer." *Def.'s Mot.* at 14 (emphasis in *Def.'s Mot.*). The plain language of the statute contains no such limitation, referring only generally to "violation of a law or rule adopted under the laws of this State or the United States." 26 M.R.S. § 833(1)(A). What is more, the line between complaints about an employer's practice and coworker's violation of a rule or law is a fluid one; coworkers' actions are often intertwined with conditions of employment. Thus, in *Currie v. Industrial Security, Inc.*, 2007 ME 12, ¶ 15–17, 20, 915 A.2d 400, 405–06, the Maine Supreme Judicial Court viewed as a protected activity, complaints made to the Border Patrol about the ability of two coworkers to work. Under the MWPA, Ms. Daigle's complaints to the Medical Board regarding Dr. Stulc's license to work as a physician deserve similar protection.

Nonetheless, the Court need not go so far as to consider whether reporting Dr. Stulc's omissions to the Board in his licensing application is a protected activity. Although Ms. Daigle's complaint to the Board of Licensure in Medicine may have been initially prompted by her discovery of Dr. Stulc's omissions, the context of Ms. Daigle's complaint about Dr. Stulc to the Board of Licensure in Medicine is that

from her perspective, she brought serious allegations of sexual harassment of both employees and patients to the Hospital administration and Redington-Fairview took insufficient remedial action, thereby endangering the employees and patients at the Hospital. Her complaint to the Board about Dr. Stulc was therefore grounded on the facts underlying her complaints to the Hospital about his creation of a hostile work environment at Redington-Fairview based on her gender.

Redington-Fairview's related point is that "[t]o come under the MWPA's protection, the employee must first bring the alleged violation to the attention of a person with supervisory authority with the employer, and allow the employer a reasonable opportunity to correct the violation." *Def.'s Mot.* at 14 (citing 26 M.R.S.A. § 833(2). Redington-Fairview is correct that the MWPA's protection:

> does not apply to an employee who has reported or caused to be reported a violation, or unsafe condition or practice to a public body, unless the employee has first brought the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation, condition or practice.

26 M.R.S.A. § 833(2). However, the requirement that the employee first involve the employer "is not required if the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice." *Id.* The Court concludes that Redington-Fairview's treatment of Ms. Daigle's previous complaints establishes a genuine issue of material fact as to whether she had reason to believe that the Hospital would not promptly correct the substance of her complaint to the Medical Board. For instance, after the November 21, 2007 incident with Jane Doe, Redington-Fairview did not notify the patient, the

National Practitioners Data Bank, or state authority, and did not address the allegedly sexual nature of the incident. From this, Ms. Daigle could have come to believe that Redington-Fairview desired to keep Dr. Stulc's transgressions internal and to treat them as professional, not sexual abuse issues. Further supporting Ms. Daigle's belief was Redington-Fairview's initial decision not to terminate Dr. Stulc and Mr. Leadbetter's previous comment to Ms. Daigle that ""Dr. Stulc is not going anywhere and if [you cannot] work with the doctor," he would "find another position" for her. PSAMF ¶ 244; DRPSAMF ¶ 244.

Ms. Daigle's position is not without controversy since at the time Ms. Daigle made the report to the Maine Board of Licensure in Medicine, Redington-Fairview had suspended Dr. Stulc. Nevertheless, accepting Ms. Daigle's version of the facts, she has raised a genuine issue of material fact as to whether she had "specific reason to believe that reports to the employer will not result in promptly correcting the violation." 26 M.R.S. § 833(2). Ms. Daigle's assertion that Redington-Fairview failed to act to protect its employees and patients is sufficient to make out a *prima facie* case bringing her within Title VII and the MHRA's prohibition against retaliation based on a plaintiff's opposition to its employment practice.

### b. Adverse Employment Action

Redington-Fairview asserts that Ms. Daigle claims she suffered adverse employment actions consisting of ostracization by co-employees and management, the February 18, 2008 written warning, the removal of her job duties as office manager, her discharge, and the Hospital's engaging in dishonesty to deny her

unemployment benefits. *Def.'s Mot.* at 14–15. The Hospital contends she cannot make out a *prima facie* case based on these allegations. *Id.* The Court disagrees.

Ms. Daigle says that as a consequence of her complaint about Dr. Stulc, the Hospital issued her a written warning, refused to promote her to the position of office manager, removed her job duties as acting office manager, and then fired her for a mistake, taking into account her written warning. All of this—written warnings, failure to promote, altering job duties, and termination—is sufficient to carry Ms. Daigle's *prima facie* burden.

### c.    Causation

Redington-Fairview next contends that Ms. Daigle failed to make out a *prima facie* case that there is a causal connection between her complaint and its adverse employment actions. Viewing the evidence in the light most favorable to Ms. Daigle, she has established: 1) that Dr. Stulc had acted inappropriately while employed at Redington-Fairview, 2) that although the Hospital suspended him, it had not terminated him, that he had lied about his prior employment history in his application to the Board of Licensure in Medicine for a license to practice medicine in the state of Maine, 3) that Ms. Daigle complained directly about Dr. Stulc to the Board, 4) that Ms. Daigle's complaint to the Board is statutorily protected, 5) that the Hospital issued her a written warning for invading an employee's privacy and for failing to notify management about the Stulc information before filing with the Board, 6) that the Hospital then not only failed to promote her but removed her job duties as the acting office manager, 7) that it fired her when she made an error on a

medical record and in so doing, considered its earlier written warning, and 8) that it challenged her right to unemployment benefits. This string of evidence is sufficient to make out a *prima facie* case of a causal connection between her complaint and the Hospital's adverse employment actions.

### d. *Prima Facie* Case Conclusion

The Court concludes that Ms. Daigle produced sufficient evidence to make out a case of retaliation under the MWPA.

### 3. Legitimate Non-Retaliatory Reasons

Under *McDonnell Douglas*, the burden now shifts to Redington-Fairview to "articulate[e] a legitimate, nondiscriminatory reason for the adverse employment action." *Mesnick*, 950 F.2d at 823. The Hospital has amply sustained its burden. It says it sanctioned Ms. Daigle not for her complaint to the Maine Board of Licensure in Medicine, but for her violation of co-employee privacy and her failure to follow internal procedures before lodging her complaint, that it hired another person as office manager because she was better qualified, that it fired Ms. Daigle because she had committed a terminable act. The Court readily concludes that the Hospital has sustained its burden of production in the burden-shifting framework.

### 4. Pretext

### a. Legal Standards

Once an employer has met its burden of production, the burden shifts to the employee "to show, unassisted by the original inference of discrimination, that the employer's proffered reason is actually a pretext for discrimination of the type

alleged." *Id.* In other words, the "ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996).

To meet this burden, the First Circuit has explained that "evidence of retaliation can be direct or circumstantial." *DeCaire v. Mukasey*, 530 F.3d 1, 20 (1st Cir. 2008). Also, that an employer's action falls within an area of discretion does not necessarily justify its action since "[d]iscretion may be exercised in ways which are discriminatory or retaliatory." *Id.* To withstand summary judgment, a plaintiff need not "prove by a preponderance of the additional evidence that [retaliation] was in fact the motive for the action taken. All a plaintiff has to do is to raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action." *Collazo*, 617 F.3d at 50 (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)) (alterations in *Collazo*). At the same time, the First Circuit said that "Courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions." *Mesnick*, 950 F.2d at 825.

### b. Evidence of Pretext

The first question is whether Ms. Daigle has established a temporal relationship between her complaint and the adverse employment action. The First Circuit has repeatedly observed that "[a] showing of [an adverse employment action] soon after the employee engages in an activity specifically protected by

section 704 (a) of Title VII, 42 U.S.C. § 2000e-3(a), is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110 (1st Cir. 1988). Ms. Daigle filed the complaint about Dr. Stulc with the Board of Licensure in Medicine on January 25, 2008 and she received a written warning on February 18, 2008, an interval of less than one month. This interval is sufficient to allow a fact-finder to conclude there is a causal connection between the complaint and the adverse employment action. *Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 25–26 (1st Cir. 2004) (finding a causal connection when the employer disciplined the employee "roughly a month" after she filed an EEO complaint); *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007) (finding a causal connection between allegations of discrimination in June 2002 and termination in August 2002).

The next links in Ms. Daigle's causation chain include her April 2008 failure to obtain the office manager position, the resulting reduction of her job duties, and her November 2008 termination. Any argument that the causal chain has been broken is contravened by Ms. Buckingham's testimony that the written warning was a factor in the Hospital's decision to terminate Ms. Daigle. Thus, temporal proximity suggests that the Hospital's actions in terminating Ms. Daigle were influenced by her complaint to the Board.

Even so, "chronological proximity does not by itself establish causality, particularly if the 'larger picture undercuts any claim of causation.'" *Wright v.*

*CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (quoting *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)). Here, there is substantial evidence from which a jury could well conclude that Redington-Fairview's actions from January 2008 onward were wholly unrelated to her complaint to the Board. First, there is no direct evidence of retaliation—no hints from any written or oral statements from the Hospital that confirm Ms. Daigle's position.

Second, the Hospital has presented a strong case that it did not sanction Ms. Daigle for reporting Dr. Stulc. In fact, Hospital management said that based on the Stulc records, they would have reported him too. Rather, Redington-Fairview clarified that it disciplined Ms. Daigle because she invaded a co-employee's privacy and failed to inform the Hospital about Dr. Stulc's records before she filed the complaint with the Board. Moreover, there is no suggestion in this record that the Hospital disagreed at all with the substance of Ms. Daigle's complaint to the Board. It separately commenced a disciplinary action against Dr. Stulc under the due process provisions of its Medical Staff Bylaws, and Dr. Stulc's resignation, which Ms. Daigle's complaint helped precipitate, avoided what might have been a contentious and protracted series of hearings.

Third, regarding the hiring of Ms. Rice, Ms. Daigle concedes that Ms. Rice is qualified to act as office manager and, in fact, Ms. Rice possessed some skills that made her more qualified than Ms. Daigle. Furthermore, other than transferring her managerial job duties to the new office manager, Redington-Fairview did not otherwise act against Ms. Daigle until November 2008.

Finally, Ms. Daigle made an extremely serious error in altering an informed consent form without obtaining clarification from the physician. When combined with her response, Redington-Fairview has a compelling argument that her actions independently justified termination.

Nevertheless, at this stage, the Court is not acting as fact-finder and the question is whether there are genuine issues of material fact that justify allowing this case to proceed to a jury. The Court concludes there are.

### D. Punitive Damages Claim

Although Redington-Fairview strenuously contends that, even viewing the evidence in the light most favorable to Ms. Daigle, the evidence would not permit a punitive damages award, the short answer is that to reach the issue of punitive damages, a jury would have had to conclude that Redington-Fairview retaliated against Ms. Daigle because she complained to the Board of Registration in Medicine about a predatory physician. Notwithstanding the Hospital's defenses, the Court concludes that Ms. Daigle has raised genuine issues of material fact that preclude summary judgment on her claim for punitive damages.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part Redington-Fairview General Hospital's Motion for Summary Judgment. The Court GRANTS Redington-Fairview General Hospital's Motion for Summary Judgment as to Counts IV and VIII and as to Count VII insofar as it is based upon allegations of a hostile work environment. The Court DENIES the Motion as to Counts V and VI, and as to

Count VII insofar as it is based upon allegations of retaliation.  Finally, the Court

DENIES the Motion as to Tanya Daigle's punitive damages claim.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 27th day of June, 2011